UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

AR-RAHEEM WILLIAMS,

                               Petitioner,

    -against-

E.R. DONNELLY, Superintendant,
Wende Correctional Facility,

                               Respondent.

------------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

00-CV-4445 (DGT)
00-CV-4447 (DGT)
00-CV-4448 (DGT)

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

     In three separate pro se petitions for writs of habeas corpus pursuant to 28 U.S.C.

§ 2254, petitioner Ar-Raheem Williams ("petitioner" or "Williams") seeks relief from the

sentences imposed upon him as a consequence of three convictions, following separate trials,

in New York State Supreme Court, Kings County. The petitions were referred to the

undersigned magistrate judge by the Honorable David G. Trager for Reports and

Recommendations. Thereafter, through newly retained counsel, Williams sought permission to

amend all three petitions to add claims of ineffective assistance of trial and appellate counsel,

and requested that proceedings on the three petitions be stayed while he exhausted his proposed

new claims in state court. For the reasons that follow, this Court recommends that Williams

be permitted to amend his petitions and that, as amended, all three petitions be denied and the

cases be dismissed.

## I. INTRODUCTION

     Williams's convictions all stem from a series of violent crimes, wherein a group of

armed young men committed three robberies in Brooklyn, shooting and killing three people in

the process. The victims included Nandahlal Ramsaran, who was shot in the head as he was locking up his butcher shop on the evening of April 10, 1993; Ramon Rodriguez, who was shot in the back, while kneeling, during a robbery of his bodega on the evening of January 4, 1994; and Mariano Fernandez, who was shot in the back at point-blank range in his grocery store on January 17, 1994.

Petitioner, along with various accomplices, was charged in three separate indictments, in connection with each of the three murders: for the murder of Fernandez, under Kings County Indictment Number 928/94; for Ramsaran's murder, under Kings County Indictment Number 1229/94; and for the murder of Rodriguez, under Kings County Indictment Number 1231/94. Each indictment charged petitioner, under an acting-in-concert theory, with robbery and murder, as well as lesser offenses.

In each of the three cases, petitioner's trial was severed from that of his co-defendants; represented by the same court-appointed attorney in all three cases, petitioner was tried before three different juries, each of which returned guilty verdicts against him. In the Rodriguez case, petitioner was convicted of one count of Murder in the Second Degree, and was sentenced by Justice Edward Pincus, on July 17, 1995, to a term of imprisonment of 25 years to life. Thereafter, in the Fernandez case, petitioner was convicted of Murder in the Second Degree, Robbery in the First Degree, and Robbery in the Second Degree. On December 7, 1995, Justice Herbert Lipp sentenced petitioner to concurrent prison terms of 25 years to life on the murder count and five to 15 years on the robbery counts, to run consecutively to the sentence imposed in the Rodriguez case. In the Ramsaran case, petitioner was convicted of

Murder in the Second Degree, Attempted Robbery in the First Degree, and Criminal Possession of a Weapon in the Second Degree. On April 8, 1996, Justice Michael Juviler sentenced him to concurrent terms of imprisonment of 25 years to life on the murder count and five to 15 years on each of the attempted robbery and weapon counts, to run consecutively to the sentences previously imposed as a result of petitioner's convictions for the murders of Rodriguez and Fernandez.

A different court-appointed attorney represented petitioner on his three direct appeals. In all three cases, petitioner's convictions were affirmed on appeal by the Appellate Division, Second Department, and his applications to appeal to the New York Court of Appeals were denied. See People v. Williams, 686 N.Y.S.2d 727 (2d Dep't), leave to appeal denied, 93 N.Y.2d 981 (1999) (Rodriguez); People v. Williams, 687 N.Y.S.2d 266 (2d Dep't), leave to appeal denied, 93 N.Y.2d 1007 (1999) (Fernandez); People v. Williams, 688 N.Y.S.2d 212 (2d Dep't), leave to appeal denied, 93 N.Y.2d 1029 (1999) (Ramsaran).

Having exhausted his remedies in state court, Williams filed pro se petitions for writs of habeas corpus in connection with all three cases. In April 2003, a notice of attorney appearance and a motion to amend the petition were entered in the Ramsaran case. Subsequently, petitioner, through his retained counsel, submitted supplemental briefs and memoranda of law in all three cases.

Petitioner is currently incarcerated.

## II. FACTUAL OVERVIEW

Pretrial evidentiary hearings were held in each of the three cases. The following is an overview of the facts surrounding petitioner's arrest and confessions, adduced at hearings held in the Fernandez case on December 20, 1994 and January 3, 1995, before the charges against the co-defendants were severed; in the Rodriguez case on March 27, 1995; and in the Ramsaran case on February 21, 22, and 26, 1996.[1]  See [#928/94] 12/20/94 Hearing Transcript ("H.Tr.") [00-CV-4445] (RX A, Vol. I-IV) ("[#928/94] H.Tr."); [#1231/94] 3/27/95 H.Tr. [00-CV-4447] (RX A, Pt. 1) ("[#1231/94] H.Tr."); [#1229/94] 2/21/96 H.Tr. [00-CV-4448] (RX A, Pt. 1) ("[#1229/94] H.Tr.").[2]  Later sections of this opinion discuss seriatim the facts and legal issues pertaining to each individual case.

### A. Petitioner's Arrest

Petitioner was implicated in all three crimes as a result of the arrest of 17-year-old Philbert Strawder ("Strawder"), on January 21, 1994, in connection with a police investigation into the robbery and murder of Mariano Fernandez.[3]  Strawder gave a videotaped statement to an assistant district attorney, wherein he explained how he and four accomplices entered the store and committed the crime. In his statement, Strawder, a "lookout" during the robbery,

---

[1]  Much of the evidence was introduced at more than one hearing and at trial.

[2]  All transcripts of proceedings in state court are appended as exhibits to the corresponding Respondent's Memorandum in Opposition ("Resp. Mem."), filed in response to each habeas petition. The first citation to each such transcript will include its state court indictment number, date, civil docket number in this District and the applicable Respondent's Exhibit number ("RX"). Subsequent references will use the specified shortened citation.

[3]  Strawder was arrested for possessing a .38 caliber handgun, identified as the weapon used to shoot Fernandez. See [#1229/94] H.Tr. at 145.

described hearing a gunshot, running away, and joining his accomplices later, at which point one of them, Jesse Guess, a/k/a "Black," stated that he had killed somebody. Additionally, Strawder said that he and his accomplices had been involved in other crimes. See [#928/94] H.Tr. at 38, 41; [#1229/94] H.Tr. at 143-45.

Strawder identified one of his accomplices as "Sakoo," who lived in the projects located at 730 Gates Avenue, in either Apartment 4B or 4D. New York City Police Detective William Komel ("Detective Komel" or "Komel") of the 81st Precinct then searched a computer database to ascertain the names of all individuals with arrest records who lived on the 700 block of Gates Avenue. That search resulted in a long list of names, including that of petitioner, Ar-Raheem Williams, nicknamed "Coo," at 734 Gates Avenue.[4] Detective Komel recalled having recently spoken to Ar-Raheem Williams about a separate matter, and believed that the nickname "Coo" was an abbreviation of "Shakoo" and referred to petitioner. Subsequently, at approximately 8:00 p.m. on the evening of January 26, 1994, Komel and Detective Peter Sloan ("Detective Sloan" or "Sloan") went to 734 Gates Avenue in order to arrest Williams in connection with the murder of Fernandez. See [#928/94] H.Tr. at 60-63. They did not have a warrant for Williams's arrest, having made no attempt to obtain one. See [#1229/94] H.Tr. at 63-64, 66-68, 87-89, 145-49.

When Williams appeared at the door from inside the apartment, one of the detectives stated that he wanted to ask him a few questions, and requested that Williams step out of the

---

[4] At a hearing, it was established that petitioner's full name is Sekou Ar-Raheem Williams, and that 730 and 734 Gates Avenue are two of multiple street addresses within the same large housing project. See [#1229/94] H.Tr. at 111, 114, 147-50.

apartment.  After Williams complied, the officers seized him and placed him under arrest.  The officers then took Williams to the 81st Precinct and locked him in an interview room on the second floor.  Detectives Komel and Sloan did not give petitioner Miranda warnings.  See [#1229/94] H.Tr. at 65-66, 149-51, 156.

B.  Police Interrogation and Petitioner's Statements

Detectives from three different police precincts subsequently interviewed petitioner consecutively about the three cases.  Detective Patrick Adams ("Detective Adams" or "Adams") met with petitioner first, in order to question him about the Fernandez case, followed by Detectives Kevin Slagg ("Detective Slagg" or "Slagg" ) and Casper Gibb ("Detective Gibb" or "Gibb") from the 79th Precinct, regarding the Rodriguez case, and Detectives William Zeller ("Detective Zeller" or "Zeller") and Chris Monzert ("Detective Monzert" or "Monzert") from the 83rd Precinct, regarding the Ramsaran case.

At about 8:30 p.m., Detective Adams read Miranda warnings to petitioner, who agreed to answer questions.  See [#928/94] H.Tr. at 47-50, 57, 67-68; see also [#1229/94] H.Tr. at 156.  In response to Adams's questions, petitioner not only confirmed that his nickname was "Kou," but also admitted traveling by car with several accomplices on the evening of January 17, 1994, and committing the crime.  Williams described entering the store and going to the back while two accomplices retrieved the money from the cash register.  He then watched as an accomplice shot a store employee, and petitioner ran out of the store with his accomplices.  Adams reduced petitioner's statement to writing, and petitioner read and signed it, at

approximately 11:40 p.m.  See [#928/94] H.Tr. at 51-53, 57-58; see also [#1229/94] H.Tr. at 156.

Williams next was questioned by Detectives Slagg and Gibbs, who arrived at the 81st Precinct after learning that there was an individual in custody on a similar robbery/murder case.  Slagg and Gibbs entered the interview room at approximately 12:30 a.m. on January 27th, whereupon Slagg introduced himself and Gibbs, and proceeded to read petitioner his Miranda rights directly from a memobook.  With respect to each separate warning, Slagg asked petitioner if he understood; as petitioner answered "yes" to each warning, Slagg checked off each response.  Petitioner indicated that he was willing to answer questions.  See [#1231/94] H.Tr. at 7-14, 40-42; see also [#1229/94] H.Tr. at 33-39, 158-59.

Slagg then described the case he was investigating.  Petitioner initially denied knowing anything about the case, but, in response to Slagg's persistent but false claims that he knew petitioner was involved and had witnesses who placed petitioner at the scene of the crime, petitioner admitted his involvement.  Petitioner insisted, however, that he had not killed anybody.  Slagg wrote down petitioner's account of the events, read it back to petitioner, and asked him to sign the statement.  Petitioner signed the statement at approximately 1:00 a.m. See [#1231/94] H.Tr. at 15-19, 34-36, 42-43, 45.

The next in line to interview petitioner was Detective Zeller, who was investigating the robbery and homicide of Ramsaran.  Shortly after arriving at the 81st Precinct at approximately 2:15 a.m., Zeller and his partner, Detective Monzert, met with petitioner in the interview room.  Zeller informed petitioner that the Miranda rights read to him previously were still in

effect, and petitioner indicated that he understood. Zeller then began writing as petitioner

described the robbery and killing of Ramsaran. When petitioner concluded his statement and

Zeller finished writing it down, Zeller read it to petitioner and asked him to sign it. Petitioner

signed the written statement, as did Zeller. See [#1229/94] H.Tr. at 10-16, 27, 159-61, 163.

At about 7:30 a.m. on the morning of January 27th, petitioner made a videotaped

statement, wherein he indicated that he wanted to see his mother and a lawyer. See [#1231/94]

H.Tr. at 26-31.

### III. GENERAL STANDARDS APPLICABLE TO ALL THREE HABEAS PETITIONS

As an initial matter, this Court notes petitioner's pro se status at the time the petitions

were filed, as well as this Circuit's requirement that pro se pleadings be construed so as "to

raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d

Cir. 1994) (citation omitted). Here, where petitioner has incorporated by reference the

arguments presented in his briefs on direct appeal to the Second Department -- briefs prepared

by petitioner's state-appointed appellate counsel[5] -- this Court will construe petitioner's state

court submissions to raise the strongest federal arguments possible.[6] Of course, habeas relief

---

[5] In each of the three cases, the state appellate briefs have been submitted as respondent's exhibits, and thus will be cited by the letter designations selected by respondent, followed by the federal court case number (e.g., "RX B [00-CV-4447]").

[6] After Williams retained counsel in connection with his habeas petitions, this Court directed his attorney to file supplemental briefs addressing the claims in the original petitions. See Court Order dated 12/12/03. Rather than elaborating on the original claims, counsel's supplemental briefs repudiated them. See, e.g., Supplemental Brief and Memorandum of Law With Request for Order Regarding Abeyance, filed 1/26/04 ("Pet. Supp. Br.") [00-CV-4445] at 3 ("The appeals opinion in this matter . . . clearly sets forth that appellate counsel was

(continued...)

is available only if a petitioner is in state "custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A habeas proceeding is not an opportunity in which to reargue previously raised claims based on state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001).

The adjudication of each of Williams's three petitions for habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Under AEDPA, a habeas petitioner must meet a demanding standard: a federal court addressing the merits of a claim shall not grant relief on the basis of a claim decided on the merits in state court unless that decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2); see Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v.Taylor, 529 U.S. 362, 404-05 (2000).

Under the second prong of the first clause, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. In other words, the appropriate question is not whether the state court's decision was incorrect or erroneous, but whether it was unreasonable in light of Supreme Court precedent. See id. at 410-12; accord

---

[6](...continued)
unable to set forth meritorious issues even though the actions of trial counsel in this and the other companion matters were suspect."). Despite habeas counsel's abandonment of the issues raised by petitioner on direct appeal, this Court nevertheless has undertaken to analyze petitioner's original pro se claims.

Brown v. Payton, No. 03-1039, 125 S.Ct. 1432, 2005 WL 645182, at *7 (U.S. Mar. 22, 2005).

In determining whether the state court made an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), the habeas court must presume that the state court's factual findings are correct and the petitioner must make a showing sufficient to "rebut[] the presumption of correctness by clear and convincing evidence." 28 U.S.C § 2254(e)(1).

## IV.  THE RODRIGUEZ CASE [00-CV-4447]

A.  Factual Background

On March 27, 1995, a hearing was held before Justice Robert Kreindler on petitioner's motion to suppress the post-arrest statement petitioner made to Detective Slagg. The prosecution called Slagg as its only witness.[7]  After cross-examining Slagg, defense counsel contended that Slagg's account of his interview with petitioner was inherently incredible, and that the prosecution had not met its burden of establishing the voluntariness of petitioner's statement. See [#1231/94] H.Tr. at 47-49. The trial court credited Slagg's testimony and denied petitioner's motion, ruling that petitioner had been fully and completely advised of his rights and that his statement to Slagg had been made voluntarily. See id. at 51-52.

Petitioner's jury trial before Justice Edward Pincus began on June 19, 1995. Detectives Slagg and Monzert testified to the contents and circumstances of the statement petitioner made to Slagg. See [#1231/94] 6/19/95 Trial Transcript ("Tr.T") [00-CV-4447] (RX A Pt. 2-3) ("[#1231/94] T.Tr.") at 113-17, 169-70, 201-02, 214, 474-76, 490, 502. The testimony of

_____

[7]  Slagg's testimony is summarized supra p. 7.

10

Marcial Espinal, Bernardo Nunez, and Abdul Mukit -- employees who were working in Rodriguez's bodega when Rodriguez was killed -- corroborated petitioner's written account of the events. See id. at 239-45, 412-16, 429-39.

According to the eyewitness testimony, at approximately 7:10 p.m., a group of five or six men entered the bodega, announced a holdup, and fanned out through the store. See id. at 238-39, 412-13, 429-32. One assailant, wearing a mask, pointed a .38 caliber revolver at Espinal, patted him down, and told him to put up his hands. See id. at 240-41, 250. A second assailant jumped over the deli counter, pointed a revolver at Nunez, ordered him to put up his hands, and forced Nunez's head into the sink where he had been washing his hands. He then pushed Nunez to the floor. See id. at 413-15, 431, 435. A third assailant, also wearing a mask, grabbed Mukit's shirt, pointed a gun at his chest, and announced a holdup. See id. at 430-31, 433, 435-37, 443, 445-46. Suddenly, a shot rang out. One robber asked the shooter, "Why did you do that?" See id. at 242, 257, 413-14, 432. The second assailant took the money from the cash register and jumped over the counter. Two others in the group came running from the back of the bodega; one of them, standing near the door, told the others to hurry. The entire group then left the store. See id. at 432, 461. Espinal, Nunez, and Mukit found Rodriguez lying face down on the floor, bleeding. See id. at 245, 423, 437-40.

At 7:35 p.m., Rodriguez was pronounced dead; the medical examiner's office later determined that a gunshot wound running from Rodriguez's back and out the front of his chest was the primary cause of his death. See id. at 307-09, 380-87. The police found a .38 caliber lead bullet fragment, fired from a revolver, on the floor of the bodega. See id. at 326-34, 342,

344-46.  The police also lifted some fingerprints from the area around the cash register, none

of which matched petitioner's (or his accomplices') prints.  See id. at 267-75, 292-94, 299-

300, 327.

Petitioner was convicted of murder in the second degree and sentenced to 25 years to

life.  See [#1231/94] 7/17/95 Sentencing Transcript ("S.Tr.") [00-CV-4447] (RX A Pt. 3) at

15.  On direct appeal from his conviction, petitioner claimed that: (1) because his arrest lacked

probable cause, his confession should have been suppressed as the fruit of an illegal arrest; (2)

he was prejudiced by the introduction of evidence of uncharged crimes; (3) he was deprived of

a fair trial as a result of prosecutorial misconduct during summation; and (4) his sentence was

excessive.  On April 12, 1999, the Appellate Division affirmed petitioner's conviction, holding

that: (1) petitioner's suppression argument on direct appeal improperly relied on matters

outside the record; (2) of the claimed summation errors preserved for appellate review, none

warranted reversal because they were either "effectively cured by the court's instructions" or

"harmless"; (3) the sentence was not excessive; and (4) petitioner's other contentions were

meritless.  Williams, 686 N.Y.S.2d at 727-28.  Petitioner's application to appeal to the New

York Court of Appeals was denied on June 22, 1999.  Williams, 93 N.Y.2d at 981.

B.  Discussion

1.  The State Court's Ruling Regarding Probable Cause

As noted, the claims in petitioner's original habeas petition mirror those he raised in the

state appellate court.  The first claim concerns the circumstances of his arrest and subsequent

statement to Detective Slagg:  he contends that the statement was obtained illegally, because

the police lacked probable cause to arrest him. Accordingly, petitioner argues, his statement should have been suppressed, or, at the very least, he should be granted another hearing, on the issue of probable cause for his arrest. See RX B [00-CV-4447] at 18-19.

As respondent noted in its opposition brief in the state appellate court, petitioner's evidentiary hearing in the Rodriguez murder case did not concern the issue of probable cause -- it concerned only the voluntariness of petitioner's statement to Detective Slagg. See RX C [00-CV-4447] at 15-16; see generally [#1231/94] H.Tr. Indeed, petitioner's probable cause argument in his state appellate brief cited only the record in the Fernandez murder prosecution [#928/94] and challenged the state courts' findings of probable cause in that case and in the Ramsaran murder case [#1229/94]. See RX B [00-CV-4447] at 18.[8] The Second Department agreed with the prosecution that the probable cause claim "was not an issue in the pretrial hearing in this matter," Williams, 686 N.Y.S.2d at 727, and the appeals court expressly held that "[t]he material upon which the defendant relies in support of his contention is dehors the instant record and thus is not properly before us on this appeal." Id.

The state court's denial of the probable cause claim on procedural grounds precludes review of this issue by the habeas court. "Federal courts may not review state court decisions that rest on an adequate and independent state procedural default unless petitioner can show both cause and prejudice or a fundamental miscarriage of justice." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000) (citing Coleman v. Thompson, 501 U.S. 722,

---

[8] Petitioner's argument in his appellate brief in the Rodriguez case essentially incorporated by reference his probable cause argument in the appeal then pending in the Ramsaran case. See RX B [00-CV-4447] at 18-19.

749-50 (1991)); see also Harris v. Reed, 489 U.S. 255, 262 (1989). This so-called "independent and adequate state grounds doctrine" ordinarily precludes habeas review by a federal court where the claim in question "was dismissed by a state court because the petitioner failed to meet a state procedural requirement." Burton v. Senkowski, No. CV-94-3836 (CPS), 1995 WL 669908, at *2 (E.D.N.Y. Nov. 5, 1995) (citing Coleman, 501 U.S. at 729-30).

Petitioner does not, and indeed cannot, contend that the state court's decision was not "independent" or "adequate." Clearly, "the Appellate Division's explicit invocation of the procedural bar constitutes an 'independent' state ground . . . ." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (citing Harris, 489 U.S. at 263). As for the adequacy of the state court's holding, the prohibition against reliance on matters outside the record is a "firmly established and regularly followed" rule in New York, see generally Williams, 686 N.Y.S.2d at 727 (collecting cases); see also RX C [00-CV-4447] at 15-16, and petitioner does not argue otherwise. Nor does he contend that this case fits within the "limited category" of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." Lee v. Kemna, 534 U.S. 362, 376 (2002).

Consequently, habeas review of the probable cause claim is precluded unless petitioner can demonstrate both "cause" for and "actual prejudice" resulting from the procedural default, or a "fundamental miscarriage of justice." See Fama, 235 F.3d at 809. "Cause" requires a showing that "some objective factor external to the defense impeded [petitioner's] counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488

(1986) (quoted in <u>Burton</u>, 1995 WL 669908, at *2). Petitioner makes no such showing in this case.[9] More importantly, no actual prejudice resulted from the referenced default. As the state courts found in connection with the Ramsaran murder case [00-CV-4448], petitioner's arrest was supported by probable cause, <u>see</u> infra pp. 40, 42-43; hence, had the probable cause issue been raised in the Rodriguez case, it would not have changed the outcome of the pretrial proceedings or the trial.

Petitioner likewise fails to satisfy the alternative exception to the independent and adequate state ground bar; to demonstrate a "fundamental miscarriage of justice," the habeas petitioner must make a sufficient showing that "he is actually innocent of the crime for which he has been convicted." <u>Dunham v. Travis</u>, 313 F.3d 724, 729 (2d Cir. 2002) (citing <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995)). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324. Although petitioner, in passing, refers to himself as "[a]ctually [i]nnocent," he provides no information to support this bald assertion.[10]

---

[9] Significantly, petitioner does not allege that the probable cause issue was procedurally defaulted as a result of trial counsel's ineffectiveness, and any such claim would itself be procedurally defaulted. <u>See generally</u> <u>Jeremiah v. Artuz</u>, 181 F.Supp.2d 194, 199-200 (E.D.N.Y. 2002); <u>King v. Mantello</u>, No. CV 98-7603(SJ)(MDG), 2002 WL 32100251, at *10 & n.7 (E.D.N.Y. Nov. 19, 2002).

[10] This assertion appears at page 1 of a Memorandum of Law dated 10/10/03, filed with the Court on 11/13/03 by petitioner's retained habeas counsel. As petitioner does not integrate this conclusory claim of innocence into his constitutional arguments, it appears that he is asserting his innocence as an independent habeas claim, rather than as an exception to the adequate and independent state ground doctrine. However, "[a] showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim." <u>Spears v. Spitzer</u>, Nos. 02-CV-2301, 03-Misc-

(continued...)

Therefore, petitioner has not made a sufficient showing to satisfy the fundamental miscarriage of justice standard. See, e.g., Perez v. Greiner, No. 00Civ.5504(RCC)(KNF), 2005 WL 613183, at *7 (S.D.N.Y. Mar. 14, 2005); King v. Mantello, No. CV 98-7603(SJ)(MDG), 2002 WL 32100251, at *12 (E.D.N.Y. Nov. 19, 2002). Habeas review of the probable cause issue is therefore precluded.

### 2. Evidence of Other Crimes

Petitioner next argues that he was deprived of a fair trial because a prosecution witness "repeatedly" revealed that appellant had been charged with other crimes. See RX B [00-CV-4447] at 20-23. Specifically, petitioner claims that, in response to questions put to him, "[Detective] Slagg testified that witnesses from other homicides viewed [petitioner] in a lineup, that paperwork for [petitioner] related to another homicide, and that gaps in time between [petitioner's] arrest and examination were due to the investigation of other crimes . . . ." Id. at 22. This testimony, he claims, constituted inadmissible evidence of uncharged crimes, depriving petitioner of due process and a fair trial, in violation of the Fifth and Fourteenth Amendments. See id. at 23. The state appellate court summarily rejected this claim as lacking merit. See Williams, 686 N.Y.S.2d at 727.

Due process requires that state courts conduct criminal trials "consistent[] with 'that fundamental fairness' which is 'essential to the very concept of justice.'" Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Lisenba v. California, 314 U.S. 219, 236 (1941));

[10](...continued)
0066 (JBW), 2005 WL 588238, at *8 (E.D.N.Y. Mar. 14, 2005) (citing Herrera v. Collins, 506 U.S. 390, 400 (1993)).

see also Spencer v. Texas, 385 U.S. 554, 563-64 (1967). "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial is contrary to . . . federal law . . . ." Dunnigan, 137 F.3d at 125 (citations omitted). However, in order to prevail on a claim that an evidentiary error violated due process, the accused must show that "the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" Id. (quoting Dowling v. United States, 493 U.S. 342, 352 (1990) (internal quotation marks omitted in Dowling)); cf. United States v. Agurs, 427 U.S. 97, 108 (1976).

In this case, petitioner ignores the context in which the challenged testimony was elicited. The information was first extracted through questions asked by petitioner's counsel. On cross-examination of Detective Slagg, defense counsel propounded several questions regarding identification "line-ups" involving petitioner. See [#1231/94] T.Tr. at 134-36. With respect to one such line-up viewed by a potential witness named Mr. Smalls, defense counsel asked Slagg if anyone else had viewed that line-up; Slagg answered, "Yes. Mr. Mohammed, Mr. Nunez, Mr. Espinal and several other witnesses from the other homicides that I don't know the names." Id. at 136.[11] After an off-the-record discussion, petitioner moved for a mistrial, "on the basis of the impropriety of the answers by the detective." Id. The court denied the application, noting that defense counsel had asked a broad question about a topic beyond the scope of the prosecutor's direct examination, and that the answer was responsive to that question. See id. at 138-39. Defense counsel rejected the court's offer of a

---

[11] The results of that line-up were not disclosed.

curative instruction because he did not want to "call this to the attention of the jurors anymore." Id. at 138.

Defense counsel also questioned Slagg about the videotape that was made subsequent to petitioner's three confessions, including whether Slagg had any paperwork reflecting the time the tape was made. Slagg answered, "[n]o, I wouldn't because it wasn't my video, it was on the other homicide, therefore Detective Adams was taking care of it." Id. at 157. Petitioner's counsel did not at that time object to the answer or request a curative instruction. Instead, he asked follow-up questions concerning the video. See id. at 157-58.

Petitioner further complains that the prosecutor elicited, on direct and redirect examination of Detective Slagg, the fact that at the time Slagg interviewed petitioner and obtained his statement, petitioner was already arrested and in custody pursuant to police investigations on cases other than the Rodriguez case. See RX B [00-CV-4447] at 10-11, 22. In fact, during direct examination, the only information disclosed was that petitioner was in the custody of detectives from another precinct – not that he was being held on other charges. See [#1231/94] T.Tr. at 100-02. On redirect, after another homicide had come to light on cross-examination, the trial court allowed Slagg to testify that he and the other officer were involved in "other business . . . ." Id. at 221. The court immediately cautioned the jury that "other business doesn't necessarily mean other crimes." Id. at 221-22.

Upon the conclusion of Slagg's testimony, the defense moved for a mistrial, arguing that the prosecutor "ha[d] made a very concerted effort . . . to bring out information concerning other homicides, other investigations, and the defendant's other arrest, which are

all improper." Id. at 232-33. The court denied the motion, concluding that its instructions and

clarifying questions to the witness had limited the issue of petitioner's arrest and custody to the

Rodriguez case. See id. at 233.

Petitioner's contention that he was deprived of a fair trial ignores analogous federal

caselaw. In Dunnigan, the prosecution elicited testimony from Dunnigan's parole officer in

order to identify Dunnigan's voice from a recorded telephone message and thus link him to the

crime. Prior to trial, Dunnigan had argued that proof of his parole status was unfairly

prejudicial and that the court should exclude the witness's testimony that he was Dunnigan's

parole officer. Acknowledging that the testimony might have some prejudicial effect, the trial

court offered to give a limiting instruction, but declined to exclude the evidence, citing its

relevance to the witness's identification of Dunnigan. See Dunnigan, 137 F.3d at 121-22. The

resulting testimony of the parole officer not only disclosed Dunnigan's status as a parolee, but

also revealed that the witness supervised convicted felons and that Dunnigan had served time at

Attica Correctional Facility. See id. at 122, 126. Dunnigan did not object to the witness's

testimony when it was elicited, nor did he request a limiting instruction; the trial court thus did

not give a limiting instruction or caution the jury to disregard Dunnigan's criminal history.

See id. at 122-23, 126.

Against this factual backdrop, the Second Circuit concluded that Dunnigan was not

denied "that fundamental fairness which is essential to the concept of justice." Id. at 126.

Noting Dunnigan's failure during trial to object or request a limiting instruction, the Court of

Appeals "ha[d] no doubt whatever, in light of the pretrial discussion, that had Dunnigan

reminded the court, the court would have given the required instruction." <u>Id.</u> at 127.

Dunnigan's petition for habeas relief was therefore denied.

In this case, in response to defense objections to the challenged testimony, and in order to mitigate any possible unfair prejudice, the state court either offered to give curative instructions, <u>see</u> [#1231/94] T.Tr. at 138, or did in fact give such instructions, <u>see</u> <u>id</u>. at 221-22, 233, and the jury is presumed to have followed them. <u>See</u>, <u>e.g.</u>, <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987); <u>United States v. Potamitis</u>, 739 F.2d 784, 790 (2d Cir. 1984); <u>Roldan v. Artuz</u>, 78 F.Supp.2d 260, 281-82 (S.D.N.Y. 2000) (even if testimony included inadmissible evidence of uncharged crimes, the trial court's prompt curative instructions to the jury eliminated any risk of unfair prejudice). The challenged testimony thus did not deprive petitioner of a fundamentally fair trial. <u>See</u> <u>Collins v. Scully</u>, 755 F.2d 16, 18-19 (2d Cir. 1985); <u>Joyner v. Miller</u>, No. 01 Civ. 2157 (WHP) (DF), 2002 WL 1023141, at *8 (S.D.N.Y. Jan. 7, 2002). As the decision in <u>Dunnigan</u> amply establishes, the state court's decision rejecting this claim was not contrary to, nor did it amount to an unreasonable application of, federal law as established by the Supreme Court.

3. The Prosecutor's Comments on Summation

Petitioner additionally claims that several of the prosecutor's comments during summation deprived him of a fair trial. The first comment concerned the absence of fingerprint evidence connecting petitioner to the crime; the second concerned petitioner's videotaped statement that he wanted to see a lawyer; a third concerned the prosecutor's sympathetic description of the victim of the crime. The state appellate court held that "none

[of the claimed summation errors preserved for review] warrants reversal as they were either effectively cured by the court's instructions or were harmless." Williams, 686 N.Y.S.2d at 727.

A writ of habeas corpus will not issue on the basis of prosecutorial misconduct during summation unless such conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). To prevail on a due process claim, the habeas petitioner must establish that "the prosecutor's comments constituted more than a mere trial error," Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998); he must further show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Id. (quoting Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994)); accord Kae v. Artuz, No. 98-CV-4711 (FB), 2000 WL 1738339, at *4 (E.D.N.Y. Nov. 21, 2000). For the reasons discussed below, the state appellate court was not unreasonable in rejecting petitioner's challenge to each of the claimed instances of misconduct.

a. Fingerprint Evidence

Petitioner's first complaint concerns the prosecutor's commentary on testimony regarding fingerprint evidence taken at the scene of the crime. The prosecution established in its case-in-chief that the police crime scene unit lifted four readable latent fingerprints from the crime scene, none of which matched petitioner's print. See [#1231/94] T.Tr. at 267-75. The state's fingerprint expert did explain to the jury, however, that one can touch a surface without

leaving a readable print.  See id. at 267.  On cross-examination, petitioner's counsel asked the witness:  "So, as far as you are concerned, you have no idea whether these 12 people sitting here in the [jury] box were involved or present at the scene of the crime; is that correct?"  The witness replied:  "That's correct, sir."  Id. at 274-75.

Thereafter, during summation, defense counsel emphasized the absence of fingerprint evidence linking petitioner to the crime scene.  See id. at 548.  In turn, the prosecutor told the jury that she was sure that, if latent fingerprints were lifted from the courtroom, there would be no match with the jurors' prints.  See id. at 572.  The trial court overruled petitioner's objection.  See id.

Petitioner now contends that the prosecutor's comment "was clearly outside the scope of the testimony and allowed the prosecutor [to] use the integrity of her office to bolster the case," and that, "[b]y allowing the comment over defense objection, the court gave the argument the appearance of legitimacy; in addition, the court effectively allowed the prosecutor to undermine one of appellant's defenses without basis in the record."  RX B [00-CV-4447] at 25-26.

It is well established that "[t]he prosecutor's comments must be assessed in light of the defense summation" and where, as here, "a prosecution comment is a rejoinder to defense counsel's comments, that factor ameliorates the effect of an objectionable prosecution comment upon the fairness of a trial."  McEachin v. Ross, 951 F.Supp. 478, 482 (S.D.N.Y. 1997) (citing United States v. Tutino, 883 F.2d 1125, 1136 (2d Cir. 1989)); see also United States v. Young, 470 U.S. 1, 11-13 (1985); United States v. Friedman, 909 F.2d 705, 709 (2d Cir.

1990); United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981); Henry v. Scully, 918

F.Supp. 693, 711 (S.D.N.Y. 1995), aff'd, 78 F.3d 51 (2d Cir. 1996).

In this case, defense counsel emphasized the absence of fingerprint evidence connecting

petitioner to the scene of the crime, and asked the prosecution's expert a rhetorical question

concerning the possibility of the jurors' involvement at the scene of the crime. The

prosecutor's comments to the jury thus constituted a fair response to the defense challenge to

the prosecution's case, see United States v. Germosen, 139 F.3d 120, 129 (2d Cir. 1998);

United States v. Pena, 793 F.2d 486, 490-91 (2d Cir. 1986); Davis v. Keane, No. 97 Civ.

8328 (NRB), 2000 WL 1041454, at *7 (S.D.N.Y. July 28, 2000), and did not have a

substantial and injurious effect on the jury's verdict. The state court's decision was not an

unreasonable application of federal law, as pronounced by the Supreme Court.[12]

b. Petitioner's Post-Arrest Statement

The second comment assailed by petitioner concerned a portion of the videotape taken

of petitioner the morning after providing his post-arrest statements, wherein petitioner offered

to make a deal with the assistant district attorney and, when told that no promises could be

made, asked for his mother and for a lawyer. In summation, the prosecutor argued that, at that

point, petitioner knew that he was going to be indicted and, once indicted, was constrained to

_____

[12] In Donnelly, the Supreme Court reversed the lower court's grant of habeas relief, where, in response to defense counsel's expression of hope that the jury would return a verdict of not guilty, the prosecutor commented to the jury: "I quite frankly think that [the defendant and his attorney] hope that you find him guilty of something a little less than first-degree murder." 416 U.S. at 640. The defense attorney objected, and the trial judge later gave a strong curative instruction charging the jury to disregard the statement. See id. at 641.

retreat from his post-arrest statement. See [#1231/94] T.Tr. at 581. Petitioner's objection was sustained by the trial court. See id.

Petitioner then moved for a mistrial, arguing that the prosecutor's comments improperly implied that the indictment was proof of guilt and shifted the burden of proof to the accused. The court denied the motion and immediately instructed the jury that the indictment was not evidence. See id. at 593[13]; see also id. at 633. The prosecutor then resumed, explaining to the jury that she "was not implying to [the jury] that an indictment was evidence. But my point was basically that now [petitioner] has to attack the statement . . . because that's the only thing that directly links him to this felony murder . . . ." Id. at 593-94.

On appeal and in his habeas petition, petitioner again maintains that the prosecutor's comments unfairly shifted the burden of proof to petitioner and "suggested that the indictment was proof of guilt . . . ." RX B [00-CV-4447] at 26-27. For several reasons, this claim has no merit. First, as noted, the trial court promptly provided clarifying instructions upon sustaining the defense objection. Second, at several points in his final charge to the jury, the judge emphasized the prosecution's unshifting burden of proof, explaining at one point that the burden "never, ever shifts to a defendant." [#1231/94] T.Tr. at 631; see id. at 619, 630-31, 638, 645, 650. Simply put, "the trial court dissipated any adverse effects of the prosecutor's

---

[13] The court instructed the jury as follows: "Ladies and gentlemen, just to cure any possible misunderstandings and phraseology, and to remind you of the law, an indictment is evidence of nothing. The fact that a person is indicted, is not even –– doesn't even create an inference that he's in any way connected with the case. Second of all, I charge you as a matter of law, in this case, the video statement was never, ever, presented in any evidentiary capacity to the Grand Jury that returned the indictment in this case." [#1231/94] T.Tr. at 593.

comments through curative actions and its instructions in the . . . final jury charge[]."

Copeland v. Walker, 258 F.Supp.2d 105, 133 (E.D.N.Y. 2003). Consequently, "the state court acted reasonably in concluding that this was not one of the 'rare' cases in which repeated errors were so egregious as to infect the entire trial and violate due process." Id.

c. Innocent Victim

Finally, petitioner claims that the prosecutor improperly appealed to the jury's sympathies in describing the victim of the crime as a "hard working man, who was trying to live the American dream." [#1231/94] T.Tr. at 559; see RX B [00-CV-4447] at 27. After petitioner's objection was sustained by the trial court, he sought no further relief. See [#1231/94] T.Tr. at 559. In its final charge, the court instructed the jury to decide the factual issues in the case "coo[l]ly, calmly, deliberately, without any kind of emotion, without any kind of fear, favor, passion, prejudice, sympathy of any kind." Id. at 609.[14]

Petitioner now claims that his right to a fair trial was again violated by this "inflammatory" comment. RX B [00-CV-4447] at 27. Even assuming arguendo that petitioner's challenge has been preserved for habeas review, the state court's affirmance of his conviction on direct appeal was neither contrary to, nor an unreasonable application of, Supreme Court precedent. In Darden, the United States Supreme Court affirmed a denial of habeas relief despite inflammatory comments by the prosecutor in summation. See Darden, 477 U.S. at 180. "[R]eflecting an emotional reaction to the case," the prosecutor in Darden

_____

[14] The court also reminded the jurors that lawyers' arguments were not evidence and that they should disregard portions of the record to which objections were sustained. See [#1231/94] T.Tr. at 607, 614.

had commented on the fact that the accused "was on weekend furlough from a prison sentence when the crime occurred"; "implied that the death penalty would be the only guarantee against a future similar act"; and referred to the petitioner as an "animal." Id. at 179-80 & n. 9-11. The Supreme Court noted that the prosecutor's comments "did not manipulate or misstate the evidence, nor did [they] implicate other specific rights of the accused . . . ." Id. at 182.

In the instant case, petitioner has made no showing that any of the prosecutor's remarks either manipulated or misstated evidence; moreover, they were plainly less prejudicial than the comments at issue in Darden. Accordingly, the Appellate Division reasonably concluded that any summation errors were "effectively cured by the court's instructions" or "harmless." Williams, 686 N.Y.S.2d at 727; see Copeland, 258 F.Supp.2d at 132-33 (habeas relief not warranted despite prosecutor's comments to the jury, in a trial for murdering a police officer, that the victim, who had "lived a short life" and had "taken an oath to serve," "was the recipient of a symbolic message by the agents of death . . . .").

4. Petitioner's Sentence

Finally, petitioner claims that the sentence imposed upon him as a result of his conviction -- 25 years to life in prison -- is excessive, given his age (17) at the time of the crime, his involvement as a "lookout" and not the shooter, and his limited prior criminal record. See RX B [00-CV-4447] at 29-31.

"[F]ederal courts conducting habeas corpus review are precluded from examining state criminal sentencing decisions based on state law so long as those decisions do not violate the federal constitution." Jamison v. Senkowski, No. 99 CIV. 9424 NRB, 2001 WL 246397, at

*8 (S.D.N.Y. Mar. 13, 2001) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).

Petitioner does not and cannot allege any federal constitutional violation, as it is well established that "[t]he Eighth Amendment condemns only punishment that shocks the collective conscience of society." United States v. Gonzalez, 922 F.2d 1044, 1053 (2d Cir. 1991).

As the Second Circuit has observed, "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam). Thus, federal courts have consistently rebuffed constitutional challenges to similar or even harsher sentences. See, e.g., Mackenzie v. Portuondo, 208 F.Supp.2d 302, 320-21 (E.D.N.Y. 2002) (rejecting an excessive sentence challenge where petitioner was sentenced to four concurrent terms of 25 to life for kidnapping in the second degree, robbery in the third degree, and unauthorized use of a motor vehicle in the first degree, to run consecutively to previously imposed three-to-six-year sentence); Ramirez v. Leonardo, 764 F.Supp. 762, 764, 765 (E.D.N.Y. 1991) (rejecting challenge to prison term of 8½ to 25 years for first degree manslaughter, to run consecutively to concurrent terms of five to 15 years for attempted manslaughter and weapons possession, one to three years for unlawful imprisonment, and one year for child endangerment). Indeed, the Second Circuit has upheld harsh New York State prison sentences for non-violent crimes. See, e.g., Carmona v. Ward, 576 F.2d 405, 414-15 & n.17 (2d Cir. 1978) (collecting cases). Accordingly, the Appellate Division's rejection of petitioner's challenge to his sentence was not contrary to, or an unreasonable application of, Supreme Court precedent. See generally Lockyer v. Andrade, 538 U.S. 63, 73-77 (2003) (sentence of 50 years to life in prison for two

counts of petty theft under California's "three strikes" law was not "objectively unreasonable"); Ewing v. California, 538 U.S. 11, 28-31 (2003) (sentence of 25 years to life, imposed on defendant convicted of stealing $1,197 worth of golf clubs, was not grossly disproportionate under the Eighth and Fourteenth Amendments).

## V. THE FERNANDEZ CASE [00-CV-4445]

A. Factual Background

Pretrial hearings in the prosecution of petitioner for the murder of Mariano Fernandez began on December 20, 1994, before Justice Francis Egitto. See generally [#928/94] H.Tr. The prosecution called Detective Adams to testify to the circumstances surrounding Strawder's statement implicating petitioner in the crime, and to the circumstances surrounding petitioner's statement regarding his own involvement. See id. at 7-65. In response to defense counsel's suggestion near the conclusion of that hearing that he might seek to challenge the existence of probable cause to arrest petitioner, the trial court summarily denied the motion, noting that Strawder had implicated petitioner in the crime and had supplied a nickname and address (including an apartment number). See id. at 141-42.

Petitioner's trial before Justice Herbert Lipp began on November 9, 1995. The prosecution built its case on testimony from employees who were working at Fernandez's store when the crime was perpetrated, and from Detective Adams, who testified to petitioner's post-arrest statement. The eyewitness testimony established that, at about 6:15 p.m. on January 17, 1994, five men between the ages of 19 and 25 entered a grocery store at 1072 Broadway in Brooklyn. Two of the men approached employee Felix Alvarez, one approached Fernandez,

who was working behind the register, and two of them went to the back of the store. The two men who approached Alvarez drew revolvers and shouted, "Nobody move!" See [#928/94] 11/14/95 T.Tr. [00-CV-4445] (RX A, Vol. VIII - XVII) ("[#928/94] T.Tr.") at 122-24. Meanwhile, one of the men entered a room in the back of the store, pulled a gun, and yelled at the people in that room to get on the floor. See id. at 164-66. Suddenly, four gunshots were fired. Bedlam ensued, as the cash register and racks of merchandise fell to the floor, and the five assailants fled the scene. See id. at 124, 126, 166. When the police and medical personnel arrived, Mariano Fernandez was on the floor on his back, dead of a bullet wound running from his back out through his chest. See id. at 127, 180-81, 184-85, 224.

Petitioner was convicted of murder in the second degree and robbery in the first and second degrees and was sentenced to concurrent terms of 25 years to life and five to 15 years, to run consecutively to the sentence imposed in connection with the Rodriguez murder. See [#928/94] 12/7/95 S.Tr. [00-CV-4445] (RX A, Vol. XVIII) at 4-5. On direct appeal, petitioner claimed that: (1) the prosecutor's failure to offer race-neutral reasons for her peremptory challenges of African-American jurors was improper; (2) certain comments by the prosecutor during summation deprived petitioner of a fair trial; and (3) petitioner's sentence was excessive. See RX B [00-CV-4445]. On April 26, 1999, the Appellate Division unanimously affirmed the conviction. Williams, 687 N.Y.S.2d at 266. On July 7, 1999, the Court of Appeals denied petitioner permission to appeal further. Williams, 93 N.Y.2d at 1007.

B.  Discussion

   1.  Petitioner's Batson Claim

Petitioner argues that the prosecution unlawfully discriminated on the basis of race in its exercise of peremptory challenges during jury selection, in violation of the Supreme Court's holding in Batson v. Kentucky, 476 U.S. 79 (1986).  See RX B [00-CV-4445] at 15-16. Under Batson, the exclusion of a potential juror on account of his or her race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

The resolution of a Batson motion generally involves three steps: first, the party bringing the application must make a prima facie showing that the motivation for a peremptory challenge to a juror is racially discriminatory; second, where such a showing has been made, the burden shifts to the party exercising the peremptory challenge to come forward with a race-neutral explanation for the challenge; third, the trial court must make a finding as to whether intentional discrimination has been established.  See Hernandez v. New York, 500 U.S. 352, 358-59 (1991); Batson, 476 U.S. at 96-98; United States v. Franklyn, 157 F.3d 90, 97 (2d Cir. 1998).  The Second Circuit has construed Batson to require that a party making a Batson motion do so before the completion of jury selection, in order to permit the trial court to contemporaneously assess the objection and remedy any impropriety without having to repeat the entire jury selection.  See McCrory v. Henderson, 82 F.3d 1243, 1249 (2d Cir. 1996); accord United States v. Thompson, 303 F.3d 138, 142 (2d Cir. 2002) ("a defendant may default on a Batson challenge if he does not timely object."); Franklyn, 157 F.3d at 97; see also Overton v. Newton, 295 F.3d 270, 279-80 (2d Cir. 2002).

In this case, the trial court conducted jury selection in four "rounds" spanning three days: November 9, 13, and 14, 1995. See [#928/94] 11/9/95 Voir Dire Transcript [00-CV-4445] (RX A, Vol. V-VII) ("[#928/94] V.Tr."). In each "round," the court questioned a group of prospective jurors from the venire pool in order to ascertain bias or any other disqualifying factor; the parties conducted voir dire; the court thereupon entertained challenges -- for cause and peremptory -- by both parties; at the end of a "round," any juror not successfully challenged was placed on the petit jury.[15] After three such rounds, ending on the second day of selection, nine jurors had been chosen; round four began on the morning of November 14. By this point, counsel for the prosecution and the accused had each exercised multiple peremptory challenges without objection, resulting in the dismissal of each of those jurors.

During the fourth round, after the tenth juror had been selected, the prosecution made a reverse Batson motion against three of the defense's peremptory challenges. Defense counsel promptly responded with a Batson objection of his own, noting that "eleven of the last twelve challenges by the People have been against African American people." See [#928/94] V.Tr. at 167-68 [99-67 to 99-68].[16] The judge commented that "I think there is some merit to the

_____

[15] This method of jury selection has also been referred to as "the modified jury box system." Overton, 295 F.3d at 273.

[16] Pages 100 through 173 of the voir dire transcript each contain notations striking out the typewritten page number and substituting handwritten numbers from 99-1 through 99-73. These notations apparently were intended to remedy an error by the court reporter, whereby the proceedings directly following jury selection were incorrectly paginated beginning with page 101. In order to avoid confusion, references in this opinion to the pages in the voir dire transcript will include both the typewritten page number and, in brackets, the handwritten corrected number.

application of both of you," but he deferred argument and decision pending further jury selection proceedings.  See id. at 168 [99-68].

Subsequently, with twelve jurors and one alternate chosen, the court suggested to the parties that it could either (1) end jury selection and proceed to trial with only one alternate juror; (2) entertain the parties' Batson motions; or (3) allow each party to withdraw one peremptory challenge, with the court randomly choosing one of the remaining two jurors to be the final alternate juror.  See id. at 172-73 [99-72 to 99-73].  The prosecution and defense both indicated that they had "no problem" with the proposed arrangement whereby each party would withdraw one peremptory challenge.  See id. at 173 [99-73].  Accordingly, each side withdrew one peremptory challenge, and the court randomly chose one of the remaining two jurors -- juror number 6, previously stricken with a peremptory challenge exercised by the prosecutor -- to serve as an alternate juror.  The Batson issue was not further litigated, and the trial continued.  See id.

On direct appeal, petitioner claimed that the trial court's failure to elicit race-neutral explanations by the prosecution for its exercise of peremptory challenges violated the Supreme Court's holding in Batson.  The Second Department rejected petitioner's Batson claim, holding, in pertinent part, that "[petitioner]'s Batson claim is unpreserved for appellate review, as the defense counsel did not object when the court proposed a solution to both his Batson claim and the prosecutor's reverse Batson claim."  Williams, 687 N.Y.S.2d at 266 (citing People v. Rosado, 560 N.Y.S.2d 825 (2d Dep't 1990)).

The Second Circuit has squarely held that a determination by a New York State appellate court that a habeas petitioner's Batson claim is unpreserved constitutes an independent and adequate state ground for decision, thereby precluding the habeas court from reaching the merits of that claim. See Rodriguez v. Schriver, 392 F.3d 505, 509-10 (2d Cir. 2004) (although petitioner timely raised a Batson objection, he did not specifically challenge as pretextual the prosecutor's stated reasons for excusing three jurors; the Appellate Division's determination that petitioner's challenge to the removal of those three jurors was unpreserved constituted an independent and adequate state ground precluding habeas review as to those three jurors). There is a "fair and substantial basis in New York law" for applying, in the Batson context, the state's contemporaneous objection rule, section 470.05 of New York's Criminal Procedure Law ("C.P.L.") -- and for the concomitant requirement that a party must object and explain its Batson objection prior to the conclusion of jury selection. McLeod v. Moscicki, No. 02 Civ. 9335 (WHP), 2003 WL 22427757, at *6 (S.D.N.Y. Oct. 22, 2003) (collecting cases); see Wilson v. Superintendent, Attica Corr. Facility, No. 900CV0767NAMGLS, 2003 WL 22765351, at *3 (N.D.N.Y. Nov. 24, 2003) ("A finding that a claim was unpreserved for appellate review is a finding of procedural default" under C.P.L. § 470.05; therefore, the Appellate Division "correctly found [petitioner's] Batson challenge unpreserved for appellate review."); Morales v. Artuz, No. 98 CIV. 6558 (JGK), 2000 WL 1693563, at *7-8 (S.D.N.Y. Nov. 13, 2000) (collecting cases). Thus, as the New York Court of Appeals observed in People v. Childress, 81 N.Y.2d 263, 268 (1993), trial counsel must "articulate and develop all of the grounds supporting the [Batson] claim, both factual and legal,

during the colloquy in which the objection is raised and discussed." Where counsel states a perfunctory or "mild objection" to the exercise of peremptory challenges, but fails to develop all of the grounds supporting the objection, the Batson claim has been defaulted. Holland v. Donnelly, 216 F.Supp.2d 227, 250 (S.D.N.Y. 2002).

In this case, defense counsel responded to the prosecution's reverse Batson motion with a Batson claim of his own. He did not elaborate on the basis for his application, and he thereafter agreed with a proposal by the trial court that, in lieu of further litigating their Batson claims, each side would withdraw one peremptory challenge and the court would randomly select one of the remaining two jurors to serve as the second alternate.[17] Given petitioner's acquiescence, and his abandonment of his Batson motion, the Appellate Division reasonably concluded that petitioner's Batson objection was unpreserved for appellate review. See McLeod, 2003 WL 22427757, at *6 ("Defense counsel in no way made it known that he was unhappy with the manner in which the trial court had dealt with the Batson issue, and thus was found by the Appellate Division not to have 'objected' in a timely fashion."); see generally Garcia v. Lewis, 188 F.3d 71, 82 (2d Cir. 1999) ("[T]he Appellate Division reached a reasonable conclusion when it deemed Garcia's claim unpreserved. A contrary holding would only encourage the kind of 'sandbagging' that procedural forfeiture rules reasonably discourage . . . ."). Accordingly, petitioner's failure to satisfy New York's contemporaneous objection requirement constitutes an adequate and independent state ground, precluding review of his Batson challenge. See, e.g., Rodriguez, 392 F.3d at 510; McLeod, 2003 WL

---

[17] Notably, as it was the juror challenged by the prosecution who was then seated, see [#928/94] V.Tr. at 173 [99-73], petitioner received the benefit of all his peremptory challenges, even the one he had agreed to withdraw.

22427757, at *5-6 (adequate and independent state ground doctrine precluded review of state court's holding that petitioner waived his right to challenge the trial court's resolution of a Batson issue without conducting the three-step Batson analysis); Holland, 216 F.Supp.2d at 250. Petitioner does not attempt to show cause and prejudice or a fundamental miscarriage of justice, "and no apparent basis for arguing either appears in the record." Id.[18]

Even assuming arguendo that the state court's holding did not rest on an independent and adequate state ground, petitioner's claim should be dismissed because, as a matter of federal constitutional law, the trial judge's disposition of the Batson issue, after discussion with and consent from counsel, did not violate clearly established Supreme Court precedent. See Overton, 295 F.3d at 280 ("We cannot say, on this record, that the trial judge's refusal to implement Batson's process for testing each questioned challenge midway in the process was an unreasonable application of the Batson requirements.").[19]

---

[18] The fact that petitioner's Batson objection followed a reverse Batson motion by the prosecutor is indicative of a defensive litigation strategy rather than unlawful discrimination. Moreover, petitioner's objection occurred on the third day of jury selection, when most of the 11 allegedly improperly challenged jurors had already been dismissed by the trial judge. Though the Court need not reach the issue, petitioner's failure to object contemporaneously would presumably amount to a waiver of his Batson claim even if petitioner had not affirmatively abandoned his challenge and consented to the trial court's proposal.

[19] The instant case bears no resemblance to United States v. Nelson, 277 F.3d 164 (2d Cir. 2002). There, the Second Circuit reversed the defendant's conviction where the trial court, with the parties' consent and for the express purpose of creating a jury fairly balanced in terms of its representation of the African-American and Jewish communities in a racially-charged case, empanelled a Jewish juror who had expressed doubt as to his ability to be fair and impartial. See id. at 172 & 211. In dictum, the Court of Appeals stated that it could not "imagine that an agreement by the defense not to object on Batson grounds, to the prosecution's use of racially based peremptory challenges, if made in exchange for the prosecution's commitment to let the defense employ racial criteria in its peremptory

(continued...)

2. Prosecutor's Remarks in Summation

Petitioner next claims that a hypothetical story spun by the prosecutor during summation was improperly allowed by the trial court over a defense objection, thereby depriving petitioner of a fair trial. <u>See</u> RX B [00-CV-4445] at 17-18.

In the prosecutor's story, young Charlie gets into trouble at school, his mother finds out about it, and, upon Charlie's arrival home, presses him for details about his day. At first Charlie indicates that everything went fine, but when his mother tells him she already knows what happened, he confesses to having gotten in trouble. The prosecutor compared this scenario to Detective Adams's description of his interview of petitioner, offered at trial, wherein petitioner, who initially denied knowledge of the crime, gradually admitted his involvement after being prodded by Adams and told that the detective already knew he had been involved. <u>See</u> [#928/94] T.Tr. at 491-92.

Petitioner argues that the prosecutor's story unfairly prejudiced him, because it

---

[19](...continued)
challenges, could stand." <u>Id.</u> at 212 n.57. In addition to being factually distinguishable from the instant case, <u>Nelson</u> does not provide a basis for habeas relief because it involves dictum in a Second Circuit opinion issued long after petitioner's conviction became final. <u>See</u> <u>McKinney v. Artuz</u>, 326 F.3d 87, 96 (2d Cir. 2003) (noting, in connection with a Batson claim, that "[a] petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent.") (quoting <u>Yung v. Walker</u>, 296 F.3d 129, 135 (2d Cir. 2002)); <u>Overton</u>, 295 F.3d at 275-76 ("The phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' refers to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'") (quoting <u>Williams</u>, 529 U.S. at 412). Finally, <u>Nelson</u> involved a direct appeal from a criminal conviction; as the Second Circuit noted in a Batson habeas case, direct appeals are not governed by "the deferential standard prescribed by AEDPA," and therefore the outcomes of cases on direct appeal may be entirely different from those on collateral review. <u>Overton</u>, 295 F.3d at 280 n.12.

improperly implied that the prosecution possessed additional information, not introduced at trial, establishing petitioner's guilt.  See RX B [00-CV-4445] at 17-18.  The Appellate Division did not deem this claim worthy of serious consideration, addressing it only by way of a catch-all disposition:  "The defendant's remaining contentions are without merit."  Williams, 687 N.Y.S.2d at 266.

Properly viewed in context, the prosecutor's comments did not deprive petitioner of a fair trial.  During his summation, petitioner, through counsel, emphatically called into question Adams's credibility and account of the interview.  See [#1229/94] T.Tr. at 454-69. As respondent persuasively argues, the prosecutor's hypothetical was merely a rhetorical device designed to demonstrate the reasonableness of Adams's account, not to indicate that Adams possessed additional information regarding petitioner's participation in the crime.  See RX C [00-CV-4445] at 31-32.  That the jury would not have inferred from the remarks that Adams had such additional evidence is established by the trial court's final charge to the jury, wherein the judge instructed the jurors to base their decision solely on the evidence and reminded them that counsels' summations did not constitute evidence.  See [#1229/94] T.Tr. at 512.  The jury is presumed to have followed that instruction.  See cases cited supra p. 20. Accordingly, the prosecutor's remarks were not so unfair and injurious as to constitute a denial of due process (see cases cited supra pp. 22, 25-26), and the state court's rejection of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

3.  Petitioner's Sentence

Lastly, petitioner challenges as excessive his sentence of 25 years to life for the murder

conviction and five to 15 years for each of the lesser offenses, to run consecutively to his

sentence in the Rodriguez case.  The Appellate Division summarily concluded that "[t]he

sentence imposed was not excessive."  <u>Williams</u>, 687 N.Y.S.2d at 266 (citation omitted).  For

the reasons discussed above with respect to petitioner's challenge to the sentences imposed on

him in connection with the Rodriguez murder (<u>see</u> supra p. 26-28), petitioner offers no basis

for federal court relief from the sentence imposed on him by the state court.

## VI. THE RAMSARAN CASE [00-CV-4448]

A.  Factual Background

The  Ramsaran case featured the most extensive pretrial litigation of the three

prosecutions.  Over three days in February 1996, Justice Michael Juviler held a hearing on

petitioner's motion to suppress the statement he made to Detective Zeller.  <u>See generally</u>

[#1229/94] H.Tr.  The prosecution first called Detectives Zeller and Slagg to testify to the

circumstances surrounding petitioner's statement, and called Detective Komel to testify to the

circumstances surrounding petitioner's arrest, <u>see id.</u> at 7-31, 33-50, 62-72; the prosecution

then rested, <u>see id.</u> at 72, and petitioner asked the trial court to suppress his statement.  <u>See id.</u>

at 73.

After some debate among counsel and the court as to the proper scope of the hearing,[20]

_____

[20]  The uncertainty stemmed from an earlier ruling in the case by a different justice, as well as
previous litigation in the Fernandez case.  Believing that the motion concerned only the

(continued...)

the court, citing the interests of justice, decided to reopen the hearing, over petitioner's objection, in order to allow testimony on the issue of probable cause for petitioner's arrest. See id. at 75-82. When the court reconvened several days later, the prosecution recalled Detective Komel to testify concerning the probable cause issue, and also called his partner, Detective Sloan, to give further testimony regarding petitioner's arrest. See id. at 85-100, 118-27. Petitioner's mother appeared as a defense witness, testifying that the arresting officers pulled petitioner out of the apartment and threw him against a wall before arresting him. See id. at 111-12. She also claimed that she was denied access to her son at the precinct, where officers told her that petitioner was just being asked some questions and would be home later. See id. at 113.

The defense then renewed its application, arguing that petitioner's post-arrest statement should be suppressed on any of several grounds: his arrest was not based on probable cause, in that there was insufficient basis to believe that petitioner was the accomplice referred to by Strawder as "Sekoo" in his videotaped statement; the arrest at petitioner's home was unlawful, because the arresting officers did not procure an arrest warrant, and tricked petitioner into leaving his apartment in order to arrest him outside his home; petitioner's statement was not preceded by Miranda warnings, and the Miranda warnings given to petitioner prior to eliciting statements regarding other homicides were not effective as to this case. See id. at 132-37.

_____

[20](…continued)
circumstances surrounding, and voluntariness of, petitioner's post-arrest statement, the prosecution offered testimony limited to those issues, whereas defense counsel then challenged the existence of probable cause to arrest, arguing that the evidence on that issue constituted double hearsay. See [#1229/94] H.Tr. at 73-74.

The hearing court held that there was probable cause to arrest "Sekoo," the individual referred to in Strawder's videotaped statement, for the murder of Mariano Fernandez; the court found Strawder's statement sufficiently trustworthy, inasmuch as it was against his penal interest, Strawder claimed to have been involved in other crimes with Sekoo, and Strawder had been arrested, four days after Fernandez's murder, in possession of the murder weapon. Probable cause to believe that "Sekoo" referred to petitioner was established by the fact that Strawder provided an address for "Sekoo" (i.e., 730 Gates Avenue) where petitioner, who was nicknamed "Coo" and who lived in the same housing project (at 734 Gates Avenue), had previously been arrested. The court also concluded that petitioner's mother was not unlawfully prevented access to petitioner after he was taken to the 81st Precinct, and that petitioner's statement was made voluntarily, after having been advised of his Miranda rights. Accordingly, the court denied petitioner's motion to suppress his statement to Detective Zeller. See id. at 143-64.

Petitioner's jury trial in Kings County Supreme Court was presided over by Justice Juviler. See [#1229/94] 3/4/96 T.Tr. [00-CV-4448] (RX A, Pt. 2-3) ("[#1229/94] T.Tr."). Petitioner's post-arrest statement and other testimony established that petitioner and three accomplices had initially planned to "do a weed spot," i.e., rob a location where marijuana was being dealt. Instead, the group came upon a man closing up a shop -- a man later identified as Ramsaran -- and robbed him, brandishing firearms. In the confusion that ensued, one of petitioner's accomplices, "Manny," shot Ramsaran in the head. Petitioner later gave his weapon, a .22 caliber handgun, back to Manny, and received $150 for participating in

the robbery as a lookout.  See id. at 467-71.

Detectives Adams, Slagg, and Zeller testified regarding petitioner's statement and the circumstances surrounding it.  See id. at 457-73, 510-33, 576-79, 607, 609-14, 624, 633.  The prosecution's other witnesses corroborated in all material respects the narrative of events given by petitioner in his statement.  In addition to calling the three detectives, the prosecution called Savitri Ramsaran, the victim's daughter, who had visited Ramsaran at his shop from approximately 8:15 p.m. until 9:00 p.m. on April 10, 1993, later at the hospital and, unfortunately, at the morgue, see id. at 394-401; Valerie Hanberry, a witness who, at sometime after 10:00 p.m. that night, saw the victim locking up his shop, saw a group of young black males lurking nearby, heard a gunshot, and saw the perpetrators flee the scene as Ramsaran lay wounded on the ground near his store, see id. at 439-48; Matthew Higgins, one of the police officers who responded to the scene minutes after the shooting occurred, and who later vouchered the spent .357 caliber shell recovered at the hospital, see id. at 682-90; and Associate Medical Examiner Kari Reiber, who performed an autopsy on the body of Ramsaran, and determined the cause of death to be a gunshot wound entering the victim's left temple and out the back of his head.  See id. at 558-63, 700.

Petitioner was convicted of murder in the second degree, attempted robbery, and criminal possession of a weapon, and was sentenced to concurrent prison terms of 25 years to life and five to 15 years, to run consecutively to the sentences imposed in connection with the Rodriguez and Fernandez murders.  See [#1229/94] 4/8/96 S.Tr. [00-CV-4448] (RX A, Pt. 3) ("[#1229/94] S.Tr.").

On direct appeal, petitioner argued, through counsel, that: (1) before trial, the court

41

erred, first, in reopening the suppression hearing to allow the prosecution to introduce

additional evidence, and, second, in denying his motion to suppress his confession; (2) the trial

court erred in refusing petitioner's request for supplemental jury instructions on the

voluntariness of his confession; (3) various evidentiary errors deprived petitioner of a fair trial;

and (4) his sentence was excessive. See RX B [00-CV-4448] at 23-40. The Appellate

Division, Second Department, affirmed Williams's conviction, see Williams, 688 N.Y.S.2d at

213, holding in a terse opinion that: (1) the hearing court properly reopened the suppression

hearing and found probable cause for Williams's arrest; (2) the sentence was not excessive;

and (3) Williams's remaining contentions were meritless. See id. Williams's application for

leave to appeal to the New York Court of Appeals was denied on August 17, 1999. See

Williams, 93 N.Y.2d at 1029.

B.  Discussion

1.  The State Court's Ruling on Petitioner's Motion to Suppress

In his first claim, petitioner argues that the state hearing court erroneously reopened the

hearing on his motion to suppress his post-arrest statement to Detective Zeller, and then erred

in denying the motion. See RX B [00-CV-4448] at 23-31.

As described above, petitioner litigated these issues at a pretrial hearing in state court.

The hearing court made detailed findings of fact after receiving testimony from several

witnesses and hearing arguments from counsel, and the court concluded that petitioner's

statement should not be suppressed. In affirming the trial court's ruling, the appellate court

held as follows:

Contrary to the defendant's contention, the court properly reopened the suppression hearing to allow additional evidence to be heard. The court appropriately permitted the People to adduce further evidence relative to the issue of probable cause in light of its discretionary ruling to expand the scope of the hearing to include a Dunaway hearing, thereby according the People one full opportunity to prove that the arrest of the defendant was lawful. We agree that the police had probable cause to believe that the defendant was the person referred to in the inculpatory statement of the codefendant as being a participant in another robbery-homicide and that the police properly arrested the defendant in connection with that crime.

Williams, 688 N.Y.S.2d at 213 (citations omitted).

Pursuant to firmly established Supreme Court precedent, a federal court may not grant habeas relief on the basis of a Fourth Amendment challenge to a search and seizure unless the state court did not afford the petitioner an opportunity for a full and fair litigation of the claim. See Stone v. Powell, 428 U.S. 465 (1976); Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991). The Second Circuit thus has held that review by a habeas court is appropriate only if the state court has provided no procedure to redress the alleged violation, or if the claimant was not afforded an opportunity to utilize such a procedure "because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

As respondent notes, the Second Circuit has expressly approved the procedure provided in New York Criminal Procedure Law Article 710 for redressing Fourth Amendment violations. See Resp. Mem. [00-CV-4448] at 4 (citing Capellan, 975 F. 2d at 70 n.1); McPhail v. Warden, Attica Corr. Facility, 707 F.2d 67, 69 (2d Cir. 1983); Gates v. Henderson, 568 F.2d 830, 837 & n.4 (2d Cir. 1977) (en banc); Holmes v. Scully, 706 F.Supp. 195, 201 (E.D.N.Y. 1989). As that was the procedure pursuant to which petitioner's claim was litigated in state court, and nothing in the record suggests "an unconscionable breakdown

in the process," this Court may not reach the merits of petitioner's Fourth Amendment claim.

2.  The State Court's Rulings on Petitioner's Request to Charge

As part of his first claim for relief -- which this Court will treat as a separate claim -- petitioner complains that the state court erred in not adequately charging the jury, upon petitioner's request, on the issue of the voluntariness of his post-arrest statement to Detective Zeller.  Specifically, petitioner raises two challenges that are detailed in his brief to the Appellate Division: first, that where he argued to the jury "that he had requested counsel prior to giving his statement, as reflected in his videotape, the court should have instructed the jury that a request for counsel renders any subsequent statement involuntary," RX B [00-CV-4448] at 29-31; and second, that where petitioner contended that his confession was tainted by the failure of Detective Adams to properly provide Miranda warnings at the outset of the initial interrogation, "the jury should have been advised that absent attenuation, subsequently advising [petitioner] of his constitutional rights was insufficient where the initial inquiry had been improper."  Id. at 30-31.

The trial court instructed the jury at length on the issue of voluntariness with regard to petitioner's statement to Detective Zeller.  See [#1229/94] T.Tr. at 945-52.  Justice Juviler charged the jury that the prosecution had to prove the following facts beyond a reasonable doubt:  that petitioner's statement to Zeller was made voluntarily, of his own free will; that he received, understood, and waived his Miranda rights prior to making the statement; that the police did not deny defendant access to his mother by using deception or trickery in order to obtain a statement from petitioner.  See id. at 946-50.  In addition, the court tailored its

instructions on voluntariness, explaining that "[i]t [was] a question of fact whether Detective Adams or Detective Slagg or both gave the defendant Miranda warnings and he understood them and knowingly and voluntarily waived those rights to them," id. at 948, and elaborating that the jury should "consider all the totality of facts preceding and surrounding the conversation with Detective Zeller, including, among other things, what Detective Adams and Detective Slagg said to the defendant and he to them and the time that passed between the alleged giving of Miranda warnings by Detective Slagg and the questioning of the defendant by Detective Zeller and what if anything Zeller said to the defendant about the defendant's rights and his answers to Zeller." Id. at 949.

After the court delivered its charge, petitioner requested supplemental instructions regarding his post-arrest statement. See id. at 959-60. The trial court denied petitioner's request, finding first, that there was no evidence in the record to suggest that petitioner had stated that he wanted to see a lawyer and his mother at any point prior to the videotaped statement; and second, that "[the court's] instructions on the voluntariness of the statement were adequate and accurate to convey to the jury the burden of proving beyond a reasonable doubt the defendant's understanding of his rights and his voluntary and knowing waiver of them." Id. at 962. On appeal, the state appellate court rejected petitioner's claim without comment. See Williams, 688 N.Y.S. 2d at 213.

On habeas review, where an error in a jury instruction is alleged, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the

Fourteenth Amendment." <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973). The question is not whether the trial court gave a faulty instruction, "but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." <u>Id.</u> at 147; <u>see</u> <u>also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991) (quoting and reaffirming <u>Cupp</u>). The burden becomes even more difficult where, as here, petitioner does not complain about an erroneous instruction, but instead faults the trial court for declining to include a particular instruction in its jury charge: "An omission, or an incomplete instruction, is less likely to be prejudicial than a mistatement of the law." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977).

In <u>Henderson</u>, a murder case, the Supreme Court found no constitutional error where the trial court neglected to define the element of causation in its charge to the jury. The <u>Henderson</u> Court reasoned that, since it was clear from the trial record that the jury was aware that causation was an element, and the trial court charged the jury that all elements required proof beyond a reasonable doubt, the omission of the instruction did not create a danger that the jury failed to make an essential factual determination. The Supreme Court further reasoned that the jury's explicit finding of "recklessness" under the murder statute logically included a finding that the result of defendant's conduct was "foreseeable." <u>Id.</u> at 156.

Here, as respondent argues, it is dubious at best that petitioner was entitled to either of the requested instructions as a matter of New York law. <u>See</u> Resp. Mem. [00-CV-4448] at 6; RX C [00-CV-4448] at 35-39. In any event, even if either or both were required under New York law, it does not follow that the trial court's jury charge "so infected the entire trial" as to warrant habeas relief. <u>Cupp</u>, 414 U.S. at 147. The court's instructions enabled the jury to

46

make all material determinations in this case, including those concerning the issue of voluntariness. Accordingly, the state court did not unreasonably apply Supreme Court precedent when it rejected petitioner's request for supplemental instructions on the voluntariness of petitioner's statements.

### 3. The State Court's Evidentiary Rulings

Petitioner next argues that three of the state court's evidentiary rulings were erroneous and deprived him of a fair trial. As he did on his direct appeal from his conviction, petitioner contends that the trial court erred: (1) in not allowing him to cross-examine Detective Zeller regarding a notation made by Zeller on petitioner's written post-arrest statement; (2) in preventing the defense from questioning its witness, Terence Heyward, with respect to Heyward's prior sworn statement identifying several others as perpetrators; and (3) in denying petitioner's motion for a mistrial in response to answers by Detective Zeller to defense counsel's questions on cross-examination. See RX B [00-CV-4448] at 32-38.

The Appellate Division determined that petitioner's claims were meritless. See Williams, 688 N.Y.S.2d at 213.

As previously noted (see supra pp. 17, 19-20), in order to succeed on a petition for habeas corpus, a habeas petitioner must establish not only that a state trial court's evidentiary ruling was erroneous, but that the ruling was so egregious that it "[rose] to the level of constitutional error" and thereby "deprived the [petitioner] of a fundamentally fair trial." Valentine v. New York, No. 04 Civ. 01411 HB GWG, 2004 WL 2823192, at *9 (S.D.N.Y. Dec. 8, 2004) (emphasis in original); see also Lipinski v. New York, 557 F.2d 289, 292 (2d

Cir. 1977). Thus, "petitioner bears a heavy burden," as "evidentiary errors generally do not rise to constitutional magnitude." Roberts v. Scully, 875 F.Supp. 182, 189 (S.D.N.Y. 1995) (quoting Aponte v. Scully, 740 F.Supp. 153, 158 (E.D.N.Y. 1990)), aff'd, 71 F.3d 406 (2d Cir. 1995). In this case, the trial court's evidentiary rulings did not deprive petitioner of a fundamentally fair trial.

### a. Cross-Examination of Detective Zeller

Petitioner mischaracterizes the record in arguing that the trial court erroneously prevented defense counsel from cross-examining Detective Zeller regarding a specific notation in Zeller's notes. During the pretrial evidentiary hearing, both the prosecutor and defense counsel presented arguments to the court regarding the admissibility of material written by Zeller on three pages in his notebook (including petitioner's written statement itself). Defense counsel argued that a notation reflecting that petitioner had previously been advised of his rights by Detective Adams -- when Zeller was not present -- was inadmissible hearsay.[21] The trial court agreed with defense counsel and excluded the statement. The court then indicated that, absent testimony from Detective Adams, the prosecution would be unable to establish that petitioner had been read his rights. See [#1229/94] H.Tr. at 23-24.

During trial, on direct examination, Detective Zeller testified that, before taking petitioner's statement, Zeller informed petitioner that he had been given Miranda warnings by two other detectives. See [#1229/94] T.Tr. at 458-59. Between direct and cross-examination of Detective Zeller, a colloquy occurred, out of the presence of the jury, concerning Zeller's

---

[21] Zeller's notes contained the following: "Mir. warnings: Yes. 6 statements by Det Adams, 81 Squad. Subject advised of rights." See [#1229/94] T.Tr. at 487-90, 494, 496.

notes. It was discovered during this colloquy that the original copy of Zeller's notes had been

changed, after disclosure of a copy to the defense, to add the handwritten word "reminded"

after the sentence "Subject advised of rights." See id. at 489-90. Upon learning this

information, defense counsel stated that he wished to cross-examine Detective Zeller on this

alteration, but sought guidance from the court as to whether or not such inquiry would open

the door for the prosecution to introduce the entire notation to the effect that petitioner had

been advised of his rights by Detective Adams. See id. at 495-96. The trial court concluded

that even if the defense cross-examined Zeller about his purported recent fabrication, the

advice-of-rights notation would not be admissible and that portion of the document would, at

petitioner's option, be stricken. See id. at 497. The court reasoned that the document would

not come in as a prior consistent statement because any motive to fabricate would have existed

at the time the witness took petitioner's statement. See id.

Thus, contrary to petitioner's contention, the trial court did not preclude defense

counsel from cross-examining Detective Zeller on the alteration of his notes. Defense counsel

nevertheless opted to take a different approach: in response to Zeller's claim on direct that

petitioner acknowledged having been advised of his rights by two other detectives, defense

counsel elicited a concession, on cross-examination, that Zeller's notes did not reflect that

exchange. See id. at 511-12. To have questioned Zeller about the addition of the word

"reminded" would have undermined that line of attack. Consequently, the record reflects that

the absence of cross-examination concerning the change to the notes was part of a rational

defense strategy, rather than the result of an order of preclusion. Petitioner was in no way

deprived of a fundamentally fair trial.

        b.  Heyward's Out-of-Court Statement

Petitioner's second evidentiary argument is that the trial court erred in preventing him from questioning Terence Heyward with respect to Heyward's prior sworn audiotaped statement to the police, in which Heyward claimed to have witnessed the murder and identified several others as perpetrators. The defense called Heyward to testify and, in response to defense counsel's question, Heyward stated that he did not recall the referenced interview. <u>See id.</u> at 755-56. Defense counsel requested that Heyward's statement be played back to him to refresh his recollection and, after excusing the jury, the trial court granted the request. <u>See id.</u> at 756. After listening to a portion of the tape, Heyward denied any recollection of those remarks. <u>See id.</u> at 757. The court then brought in the jury and defense counsel questioned Heyward further. Heyward claimed that he had not spoken to detectives about the shooting at issue in the case, nor had he witnessed the shooting. <u>See id.</u> at 759.

At this point, defense counsel stated that he had an application to make and the trial judge again excused the jury. <u>See id.</u> at 761-62. Counsel then argued that Heyward had become a hostile witness and that his sworn statement should therefore be played for the jury. <u>See id.</u> at 762. After extensive argument as to whether Heyward's hearsay statement -- which did not fall within any exception to the hearsay rule[22] -- was admissible as impeachment evidence under New York law, the trial court denied the application and precluded the evidence. While agreeing that Heyward had become a hostile witness, the trial judge

---

[22]  <u>See</u> [#1229/94] T.Tr. at 770-71 (noting that the out-of-court statement was not against penal interest, in that Heyward did not implicate himself in the crime).

concluded that, as his testimony did not tend to disprove a material element of petitioner's position at trial, the tape was inadmissible for impeachment purposes under section 60.35 of New York's Criminal Procedure Law.  See id. T.Tr. at 763-72.[23]  Subsequently, the trial judge ordered all of Heyward's testimony stricken from the record.  See id. at 773-74.

Petitioner's arguments relative to this issue, as set forth in his brief to the Appellate Division, rest largely on state grounds.  See RX B [00-CV-4448] at 33-36.  It is well-settled that a habeas court may review only those claims based on federal law.  See 28 U.S.C. § 2254(a); Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  Thus, petitioner's state law claims

---

[23]  Section 60.35, entitled "impeachment of own witness by proof of prior contradictory statement," provides as follows:

   1. When, upon examination by the party who called him, a witness in a criminal proceeding gives testimony upon a material issue of the case which tends to disprove the position of such party, such party may introduce evidence that such witness has previously made either a written statement signed by him or an oral statement under oath contradictory to such testimony.

   2. Evidence concerning a prior contradictory statement introduced pursuant to subdivision one may be received only for the purpose of impeaching the credibility of the witness with respect to his testimony upon the subject, and does not constitute evidence in chief. Upon receiving such evidence at a jury trial, the court must so instruct the jury.

   3. When a witness has made a prior signed or sworn statement contradictory to his testimony in a criminal proceeding upon a material issue of the case, but his testimony does not tend to disprove the position of the party who called him and elicited such testimony, evidence that the witness made such prior statement is not admissible, and such party may not use such prior statement for the purpose of refreshing the recollection of the witness in a manner that discloses its contents to the trier of the facts.

N.Y. C.P.L. § 60.35.

may not be reviewed by this Court.  Although petitioner has also alleged in passing that the trial court's ruling deprived him of the ability to present evidence on his behalf, and thereby violated his rights under the Sixth and Fourteenth Amendments of the United States Constitution (see RX B [00-CV-4448] at 35-36), he provides no legal support for his claim.

In any event, petitioner's constitutional claim is without merit because, even assuming arguendo that the trial court erroneously excluded Heyward's statement, it is undisputed by petitioner (see RX B [00-CV-4448] at 34) that, under New York law, the statement could have been presented to the jury for impeachment purposes only.  See N.Y. C.P.L. § 60.35(2); California v. Green, 399 U.S. 149, 154 (1970) ("The orthodox view, adopted in most jurisdictions, has been that the out-of-court [prior inconsistent] statement[ ] . . . may not be offered to show the truth of the matters asserted therein, but can be introduced under appropriate limiting instructions to impeach the credibility of the witness who has changed his story at trial.").  If the prior statement had been admitted for impeachment purposes, it would not have materially aided petitioner's defense; the jury would have been allowed to consider it solely in determining whether to believe or disbelieve Heyward's trial testimony -- to wit, his denial that he witnessed the murder and his purported lack of recollection of his debriefing by the authorities.  At no time has petitioner suggested that the tape could have been admitted as affirmative proof of the identities of the perpetrators.  See RX B [00-CV-4448] at 33-34. Accordingly, the exclusion of the evidence under section 60.35 of the C.P.L. did not deprive petitioner of a fair trial.  See Grochulski v. Henderson, 637 F.2d 50, 55-56 (2d Cir. 1981) (concluding that petitioner received a fair trial despite the trial court's exclusion, under section

60.35, of an informant's statement to law enforcement identifying someone other than petitioner as the murderer); Gillette v. Greiner, 76 F.Supp.2d 363, 375 (S.D.N.Y. 1999) (even if erroneous, exclusion of prior inconsistent statement was harmless, as it "would not have been admissible for the truth of [the] assertion . . . ."); see also Benn v. Greiner, No. 04-0527PR, ___ F.3d ___, 2005 WL 545025, at *5-6 (2d Cir. Mar. 9, 2005) (reversing grant of writ of habeas corpus; even if contrary to or an unreasonable application of clearly established federal law, the state court's preclusion of cross-examination of the victim of an alleged sexual assault concerning her previous rape accusations against others was harmless error). Any error in excluding such impeachment evidence was therefore harmless, whether measured against the standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), or that enunciated in Chapman v. California, 386 U.S. 18 (1967). See Brecht, 507 U.S. at 637 (holding, in habeas case predating AEDPA, that the harmless error standard is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'") (internal citation omitted); Chapman, 386 U.S. at 24 (holding that, on direct review, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").[24]

---

[24] The Second Circuit has not yet decided which standard applies under AEDPA in determining "whether a non-structural trial error challenged on collateral review is harmless when the state courts do not themselves reach the harmlessness question." Benn, ___ F.3d ___, 2005 WL 545025, at *4 (collecting cases). However, in this case, any error committed by the trial court in excluding the impeachment evidence was harmless under either standard.

c. Proof of Other Crimes

Finally, petitioner argues that the trial court erred in denying his motion for a mistrial after a prosecution witness revealed petitioner's involvement in other homicides. See RX B [00-CV-4448] at 38. Petitioner does not set forth any factual or legal support for his claim. Instead, in his brief on direct appeal, petitioner simply referenced arguments made in his appellate brief in connection with the Rodriguez murder trial. See id.

It appears that petitioner's argument relates to a portion of the transcript concerning the circumstances surrounding petitioner's post-arrest statement and his receipt of Miranda warnings. Specifically, in response to questions on cross-examination concerning what he knew of the case before speaking with petitioner, Detective Zeller testified that he knew that petitioner had just been arrested for another, similar homicide. See [#1229/94] T.Tr. at 521. When defense counsel thereupon moved to strike and to declare a mistrial, the court struck Zeller's response, denied the motion for a mistrial, and directed the jury to ignore the stricken testimony, as it "is not in the case." Id. at 521-22.[25] The trial court's prompt remedial action cured any conceivable prejudice. For the reasons previously stated, see supra pp. 17, 19-20,

---

[25] In addition, during the direct examination of Detective Slagg concerning his administration of Miranda warnings, the witness acknowledged that his investigation did not involve Ramsaran's death. See [#1229/94] T.Tr. at 577. The trial judge, sua sponte, gave the jury the following cautionary instruction:

> You are not to speculate what the conversation was about. It is not evidence of the defendant's guilt of anything. It's in evidence only to explain the time during which the defendant was in the precinct and as bearing on the question whether his statement attributed to him by Detective Zeller was voluntary, as I'll explain that later.

Id. at 578.

petitioner's claim is without merit.

In short, none of the state courts' rulings on petitioner's evidentiary challenges is either contrary to, or an unreasonable application of, Supreme Court precedent.

4. The Prosecutor's Comments on Summation

Petitioner next contends that during summation, the prosecutor impermissibly commented on petitioner's failure to present certain evidence promised in his opening statement, and thereby shifted the burden of proof to petitioner and deprived him of a fair trial. See RX B [00-CV-4448] at 36-38. The state appellate court dismissed this claim without discussion (see Williams, 688 N.Y.S.2d at 213), and, for the reasons that follow, the prosecutor's comments did not "so infect [ ] the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643); see also Policano v. Herbert, No. 02 CV 1426 (JG), 2004 WL 1960203, at * 13 (E.D.N.Y. Sept. 7, 2004).

During his opening statement, defense counsel stated that the jury would learn during trial that a confidential informant had confessed to the crime charged and named people, other than petitioner, who were involved in its commission. See [#1229/94] T.Tr. at 392. As discussed above, see supra pp. 50-51, when petitioner called Heyward as a witness, he provided no such evidence, and his testimony was stricken. Subsequently, during summation, the prosecutor commented that the defense had failed to produce the promised witness, adding that "this isn't Perry Mason where somebody else was going to come up here and say I know who did it or I did it or something else" and that "[t]his isn't made for the movies, TV or

55

something like that. This is real life." Id. at 876-77. Although the trial judge overruled petitioner's objection to the remarks, see id. at 876, he instructed the jury several times that, despite the prosecutor's comments, the accused was not required to introduce any evidence or prove that he was not guilty, and that the accused had no burden to produce any witnesses. See id. at 880, 922-23. Petitioner nevertheless contends, as he did on appeal, that the prosecutor's comments "attempt[ed] to shift the burden of proof" to the accused and therefore violated petitioner's constitutional rights. See RX B [00-CV-4448] at 37.

A prosecutor is "entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case, . . . as well as his failure to support his own factual theories with witnesses." United States v. Parker, 903 F.2d 91, 98 (2d Cir. 1990) (quoting United States v. Bubar, 567 F.2d 192, 199 (2d Cir. 1977)). However, the prosecutor is not permitted to violate the constitutional rights of the accused in doing so. Thus, a prosecutor may not comment on a defendant's failure to testify on his own behalf, or imply that the defendant has a burden to produce witnesses or evidence. See United States v. Walker, 835 F.2d 983, 989 (2d Cir. 1987); United States v. Gotchis, 803 F.2d 74, 81 (2d Cir. 1986).

In this case, the prosecutor's comments did not fault petitioner for failing to testify on his own behalf, nor did they imply that he had a burden to produce witnesses. The prosecutor simply stated that the petitioner failed to present the evidence promised in his opening statement -- testimony that other people had committed the crime. Thus, the prosecutor's comments were a fair response to the statements made by defense counsel in his opening, and

did not violate petitioner's constitutional rights.  See Quinones v. Miller, No. 01 Civ. 10752

(WHP)(AJP), 2003 WL 21276429, at *55 (S.D.N.Y. June 3, 2003).  Even assuming arguendo

that the prosecutor's comments crossed the line of impropriety, the trial court's instructions to

the jury cured any possible prejudice to the defense.  See Walker v. Scully, No. 90 CV 3328

(SJ), 1992 WL 220002, at *9-10 (E.D.N.Y. Aug. 25, 1992).

    5.  Petitioner's Sentence

    Petitioner was sentenced to concurrent prison terms of 25 years to life on the murder

charge, five to 15 years for attempted robbery, and five to 15 years for the weapons possession

charge, to run consecutively to the sentences imposed in connection with the Rodriguez and

Fernandez murders.  See [#1229/94] S.Tr. at 9-10.  This Court's analysis with respect to

petitioner's sentencing claims in those two cases, see supra pp. 26-28, 38, applies mutatis

mutandis to petitioner's claim here.  Accordingly, the state court's rejection of petitioner's

challenge to his sentence was not contrary to, or an unreasonable application of, any decisions

of the United States Supreme Court.

V.    THE PROPOSED AMENDMENTS<br>TO THE THREE PETITIONS

A.    The Procedural Background

    In April 2003, approximately two and a half years after petitioner filed his pro se

petitions for habeas corpus, a notice of attorney appearance and a motion to amend the petition

were filed in the Ramsaran case [00-CV-4448].  In light of the vague nature of the motion, this

Court issued an order requiring federal counsel for petitioner to clarify (1) "whether counsel

[was] seeking to amend the petition and claims in this case, or [was] seeking only to submit a

57

memorandum of law prepared by counsel in support of the previously filed petition and claims"; and (2) whether the notice of appearance and motion filed were limited to the Ramsaran case, or were applicable to all three cases. See Court Order dated 10/31/03 at 1. Counsel then submitted a Memorandum of Law addressing claims that had not been raised in the pro se petitions, i.e., ineffective assistance of trial counsel and appellate counsel in all three cases. See [Petitioner's] Memorandum of Law, dated 10/10/03.[26] Respondent replied in a letter, stating that, while it would not object to petitioner's new counsel filing a memorandum of law in support of the pro se petitions, respondent opposed any amendment to add the proposed new claims, as such claims were unexhausted and untimely. See Letter dated 11/21/03 from Anne V. Feigus to the Court, at 2-3.

This Court held a conference to address petitioner's requests. At the conference, petitioner, through his newly retained attorney, reiterated that he wished to amend the three petitions in order to add claims of ineffective assistance of trial and appellate counsel. See Transcript of Federal Court Proceeding on 12/12/03 ("12/12/03 Tr.") at 5-6, 16. Respondent again opposed the request to add new claims. See id. at 14-15. This Court then issued a Calendar Order requiring petitioner to file a proposed amended petition for habeas corpus in each of the three cases, and to "file a supplemental brief addressing both (a) the claims in the three original petitions and (b) petitioner's application to amend those petitions to add ineffective assistance claims." Court Order dated 12/12/03 at 1-2.

---

[26] Although dated 10/10/03, the Memorandum of Law was appended to a cover letter dated 11/11/03 and was filed on 11/13/03, in response to this Court's Order of 10/31/03. See supra p. 15 note 10.

Thereafter, in each case, petitioner's counsel submitted a document entitled "Proposed Amendment to Original Brief and Request for Order Regarding Abeyance." In these three documents, petitioner alleged that both his trial and appellate counsel were ineffective, and, citing Zarvela v. Artuz, 254 F.3d 374 (2d Cir. 2001), he requested that the proceedings in all three cases be stayed to enable him to exhaust his state remedies with respect to the new claims. Several months later, petitioner's counsel expanded his submissions with supplemental briefs in all three cases, alleging in each a slightly different claim of ineffective assistance of trial counsel and, in all three, a claim of ineffective assistance of appellate counsel based on appellate counsel's failure to argue ineffective assistance of trial counsel.[27] In addition, petitioner renewed his request to stay all three proceedings to allow him to litigate his proposed new claims in state court.

Respondent opposes petitioner's request to amend the petitions, on the ground that petitioner's new claims are barred by the statute of limitations. See [Respondent's Supplemental] Memorandum of Law ("Resp. Supp. Mem.") [00-CV-4445] at 2-4; Resp. Supp. Mem. [00-CV-4447] at 2-4; Resp. Supp. Mem. [00-CV-4448] at 2-4.[28] In the alternative, respondent requests that, in the event the Court permits petitioner to amend, the petitions be held in abeyance so that the new claims may first be exhausted in state court. See Resp. Supp. Mem. [00-CV-4445] at 6; Resp. Supp. Mem. [00-CV-4447] at 6; Resp. Supp. Mem. [00-CV-

---

[27] Ironically, although petitioner's pro se briefs contain the same claims raised on appeal to the Appellate Division, petitioner's supplemental briefs contain allegations that appellate counsel was ineffective in failing to raise any meritorious claims on appeal. See supra pp. 8-9 note 6.

[28] Each supplemental memorandum is appended to the corresponding [Supplemental] Affidavit in Opposition to Petition for a Writ of Habeas Corpus filed by respondent in that case.

4448] at 6.

B.      Discussion

1.  The Statute of Limitations Issue and Relation Back Under Rule 15(c)

AEDPA requires that a petition for habeas corpus be filed in federal court within one year of the date that the "judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[29] Petitioner's convictions became final on September 20, 1999 (Rodriguez), July 25, 1999 (Fernandez) and November 15, 1999 (Ramsaran) -- 90 days after leave to appeal to the New York Court of Appeals was denied. See Williams v. Artuz, 237 F.3d 147, 150-51 (2d Cir. 2001) (judgment is final when certiorari proceedings in the United States Supreme Court have been completed, or when the time to seek direct review in the United States Supreme Court has expired); Sup. Ct. R. 13 (petition for a writ of certiorari must be filed within 90 days after entry of judgment by a state court of last resort). Although it is undisputed that petitioner's pro se petitions were timely filed, his initial application for leave to amend was filed on April 29, 2003, well after AEDPA's limitations period had expired.

By statute, a writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. Rule 15 of the Federal Rules of Civil Procedure generally governs motions to amend petitions for habeas corpus (see Littlejohn v. Artuz, 271 F.3d 360, 363 (2d Cir. 2001); Fama, 235 F.3d at 814-15; see also Ching v. United States, 298 F.3d 174, 180-81 (2d Cir. 2002); Rule 11 of the Rules Governing

---

[29] Three alternative points at which the limitations period may begin to run in habeas cases do not apply here. See 28 U.S.C. § 2244(d)(1)(B)-(D).

60

Section 2254 Cases in the United States District Courts), and Rule 15(c)'s relation-back provision "governs the timeliness of a motion to amend submitted after AEDPA's statute of limitations has expired." Ching, 298 F.3d at 181.

Respondent contends that, under Rule 15(c), petitioner's new claims do not relate back to his original petitions and that therefore the proposed amendments should be deemed untimely. See, e.g., Resp. Supp. Mem. [00-CV-4448] at 4-6. The applicable inquiry for determining whether a new habeas claim relates back to a claim filed within the limitations period is whether the original petition gave the opposing party fair notice of the new claims. See Fama, 235 F.3d at 815. As petitioner's pro se petitions contain allegations of prejudicial error only on the part of the prosecutor and trial judge, it is doubtful that respondent had fair notice of petitioner's ineffective assistance of counsel claims. See Perez v. Greiner, No. 00Civ.5505 (RCC) (KNF), 2004 WL 2937795, at * 3 (S.D.N.Y. Dec. 17, 2004) ("because there is nothing in Perez's original habeas corpus petition which gives the respondent fair notice of the newly alleged claims [i.e., ineffective assistance of appellate counsel], it does not appear that those claims relate back to the original petition."); Brown v. Donelly, 258 F.Supp.2d 178, 183-84 (E.D.N.Y. 2003) (finding that petitioner's ineffective assistance of counsel claims did not relate back to claims in original petition); Brown v. United States, No. 02 Civ 9305 (HB), 2003 WL 22047879, at *3 (S.D.N.Y. Aug. 29, 2003) (noting that "I find it hardly likely . . . that respondent had fair notice" of one form of alleged ineffectiveness based on original claim of ineffectiveness); see also Escobar v. Senkowski, No.02Civ.8066 (LAK) (THK), 2004 WL 1698626, at *3 n.3 (S.D.N.Y. July 28, 2004) ("There is nothing in

the Petition that gives Respondent fair notice of the ineffective assistance of counsel claims now asserted, and therefore, it is doubted that the assertion of these new claims would relate back to the filing of the original Petition.").[30]

Nevertheless, this Court believes that "the simplest and wisest course is to slice through the tangles in a different direction." Newton v. Coombe, No. 95 CIV. 9437 GEL, 2001 WL 799846, at *10 (S.D.N.Y. July 13, 2001). Consistent with the approach taken by the Second Circuit in Fama, 235 F.3d at 816,[31] as well as by various district courts within this circuit, this Court would address and dispose of petitioner's proposed new claims on the merits: "Assuming arguendo, as the Court of Appeals did in Fama, that the proposed amendment would relate back to the filing of the original petition, and pretermitting the exhaustion issue, as permitted by 28 U.S.C. § 2254(b)(2) in dealing with meritless petitions, the petition must nevertheless be denied, because petitioner's new claim[s] do[] not justify habeas relief." Newton, 2001 WL 799846, at *10; see Brown, 2003 WL 22047879, at *3 ("in the interest of

---

[30] If petitioner's proposed amendments are deemed not to relate back, then the new claims would constitute new petitions, and, to have the new claims heard despite the one-year statute of limitations, petitioner would have to show that they were brought within one year of "the date on which the factual predicate of the . . . claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Petitioner makes no attempt to bring his new claims within this provision, and any such attempt would be unavailing, as petitioner bases his new arguments exclusively on matters that appeared on the record in the state trial and appellate courts. Nor could petitioner establish that his failure to file his new claims in a timely fashion was due to "extraordinary circumstances 'beyond his control,'" thereby warranting equitable tolling of AEDPA's one-year limitations period. Smaldone v. Senkowski, 273 F.3d 133, 138 (2d Cir. 2001).

[31] "To simplify this case, we will assume arguendo that, pursuant to Rule 15(c), this evidence does relate back to Fama's original petition, and hence the amendment is permissible." Fama, 235 F.3d at 816.

justice, [the court] will grant leave to amend and consider the merits of his additional claim.");

Subervi v. Stinson, No. Civ. A.97-CV-1295 (DGT) (MDG), 2003 WL 22462489, at *4

(E.D.N.Y. Oct. 10, 2003) (a habeas court acts "well within its discretion granted by Rule 11

of the § 2254 Rules in permitting [petitioner] to pursue claims in his amended petition that

might not 'relate back' to his initial petition under a literal interpretation of Rule 15(c) . . . .").

2. The Exhaustion Issue

Petitioner requests that his petitions be stayed so that he may exhaust his proposed new

claims in state court. See, e.g., Pet. Supp. Br. [00-CV-4448] at 5. Although habeas

petitioners are ordinarily required to fully exhaust their state court remedies, AEDPA provides

that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding

the failure of the applicant to exhaust the remedies available in the courts of the State." 28

U.S.C. § 2254(b)(2); see also Bell v. Cone, 125 S.Ct. 847, 850 n.3 (2005); Pratt v. Greiner,

306 F.3d 1190, 1197 (2d Cir. 2002); Padilla v. Keane, 331 F.Supp.2d 209, 215 (S.D.N.Y.

2004). No interest would be served in these cases by staying the petitions to allow petitioner

to return to state court to litigate record-based claims that are plainly meritless. See infra pp.

65-72.[32] Indeed, the Supreme Court has made clear that such a stay may not be granted unless

---

[32] Moreover, petitioner's challenge to trial counsel's effectiveness appears to be procedurally
barred "because it concerns a matter of record, which could only have been raised on direct
appeal, and there is no state court to which [petitioner] may now bring this claim." Spears v.
Spitzer, No. 02-CV-2301 (JBW), 2005 WL 588238, at *17 (E.D.N.Y. Mar. 14, 2005); see
Perez, 2004 WL 2937795, at *3 ("Under New York law, collateral review of a claim that
could have been raised on direct appeal but was not, despite a sufficient record, is procedurally
barred."); see also Escobar, 2004 WL 1698626, at *3 n.3 ("Petitioner's claims regarding his
trial counsel's conduct at trial are record-based claims, and thus were required to be brought
on direct appeal in the New York courts."); King, 2002 WL 32100251, at *8 (collecting
(continued...)

"the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court," and that, "even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." Rhines v. Weber, No. 03-9046, 125 S.Ct. 1528, 2005 WL 711587, at *5 (U.S. Mar. 30, 2005). Accordingly, as petitioner has not satisfied the stringent prerequisites to the grant of a stay, the District Court should deny petitioner's application to stay his three habeas petitions.[33]

### 3. Ineffective Assistance of Counsel: Standards

Pursuant to the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), petitioner must satisfy a two-prong test in order to prevail on a constitutional claim of ineffective assistance of counsel: he must establish both (1) that his counsel's representation fell below an objective standard of reasonableness measured by prevailing professional norms; and (2) that a reasonable probability exists that the outcome of the proceeding would have been different but for counsel's unprofessional performance. See id. at 688-92; see also United States v. Vegas, 27 F.3d 773, 777 (2d Cir. 1994). "A reasonable probability is a probability

---

[32](...continued)
cases). In contrast, because petitioner's option to bring a coram nobis proceeding to challenge appellate counsel's effectiveness is not foreclosed, this claim is unexhausted. See Excell v. New York, No. 01-CV-3073 (JBW), 2003 WL 23185749, at *13 (E.D.N.Y. Oct. 30, 2003).

[33] A permissible alternative approach would be to deny leave to amend on the ground of futility. See, e.g., Perez, 2004 WL 2937795, at *3; Lewis v. Phillips, No. 04Civ.1333 (DLC) (KNF), 2004 WL 1944383, at *2 (S.D.N.Y. Aug. 31, 2004); Hoover v. Senkowski, No. 00 CV 2662 (SJ), 2003 WL 21313726, at *11 (E.D.N.Y. May 24, 2003); Saldarriaga v. United States, No. 99 CIV. 4487 (WK), 2002 WL 449651, at *5 (S.D.N.Y. Mar. 21, 2002) (denying leave to amend habeas petition where proposed claim challenging counsel's effffectiveness was without merit); see also Ching, 298 F.3d at 180.

sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

To establish ineffective representation, a petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689. Courts need not, however, reach that issue in every case; a court may address the performance and prejudice prongs of the Strickland test in either order and, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." <u>Id.</u> at 697.

a.  Trial Counsel in the Rodriguez Case [00-CV-4447]

In his attorney's supplemental brief in the Rodriguez case, petitioner sets forth his claim of ineffective assistance of trial counsel as follows: "The people state in their response to this petition that the erroneously admitted uncharged crime evidence does not rise to the Federal level. The assumption by the people is incorrect when viewed from the light of ineffective assistance." Pet. Supp. Br. [00-CV-4447] at 2. Petitioner's brief fails to provide any analysis of his counsel's performance under the Strickland cause and prejudice standard, nor does it cite any supporting cases.

As discussed above (<u>see</u> supra pp. 16-20), petitioner's underlying claim concerning evidence of uncharged crimes is without merit; the referenced comments did not deprive petitioner of "'that fundamental fairness' which is 'essential to the concept of justice.'" <u>Dunnigan</u>, 137 F.3d at 125 (quoting <u>Lisenba</u>, 314 U.S. at 236). Furthermore, defense counsel did try without success to obtain a mistrial because of that proof; his rejection of the court's offer of a curative instruction, which would have "call[ed] this to the attention of the jurors"

([#1231/94] T.Tr. at 138), should be "considered sound trial strategy." Strickland, 466 U.S. at 689. Additionally, the jury was presented with strong evidence of petitioner's guilt, including his confession to the police, which was corroborated by a series of eyewitnesses. At most, the statements at issue suggested that petitioner had been the subject of other investigations, not that he had been convicted of other crimes. Petitioner does not allege, let alone establish, that the outcome of his trial would have been different but for the testimony that emerged during cross-examination of the prosecution witnesses. Consequently, petitioner has failed to satisfy the prejudice prong of the Strickland test.

In any event, even assuming arguendo that defense counsel might have exercised more caution in examining the law enforcement witnesses, a minor lapse on counsel's part does not, without more, establish constitutionally deficient representation. See, e.g., Morris v. Garvin, No. 98-CV-4661(JG), 2000 WL 1692845, at *3 (E.D.N.Y. Oct. 10, 2000) ("Just as criminal defendants are not entitled to a perfect trial, only a fair one, they are not entitled to error-free, perfect representation."). In determining whether the accused received reasonable professional assistance, the reviewing court should "assess counsel's overall performance throughout the case . . . ." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986). The state court record in this case reflects that defense counsel presented vigorous representation. Prior to trial, he moved (albeit unsuccessfully) to suppress the central piece of evidence against his client, to wit, petitioner's post-arrest statement. At trial, he mounted a plausible and consistent defense, seeking to persuade the jury that petitioner's statement was involuntary and unreliable and that no other evidence linked petitioner to the crimes charged. Defense counsel's opening and

closing statements, as well as his cross-examination of the prosecution's witnesses, were thoughtful and focused, plainly designed to further that defense. Defense counsel did not hesitate to object to evidence he believed to be improper, or to move for a mistrial on several occasions.[34] While the chosen defense ultimately proved unsuccessful, it in no way fell outside the wide range of reasonable professional assistance, within the meaning of Strickland.

### b. Trial Counsel in the Fernandez Case [00-CV-4445]

In support of his claim of ineffective assistance in the Fernandez case, petitioner cites trial counsel's comment that he did not care which of the three options proposed by the trial judge was used to dispose of the attorneys' cross-Batson motions. See Pet. Supp. Br. [00-CV-4445] at 3. Petitioner again provides no analysis of this claim under Strickland, nor does he cite any authority to support it.[35]

As an initial matter, petitioner has taken trial counsel's comment out of context. As set forth above (see supra pp. 31-32), the trial judge deferred argument on both the prosecution's reverse Batson motion and defense counsel's responsive Batson challenge until the end of jury selection. After the fourth round of jury selection, twelve jurors and one alternate had been chosen. At this point the trial judge stated: "We can go with one alternate, or I can entertain both applications and explore both cases for the Batson challenge, which, as I say, prima facie might have merit or beyond that. In the alternative, you can seat a second alternate, each of

---

[34] He provided petitioner with the same level of representation in the other two cases.

[35] Petitioner's Strickland challenge reads as follows: "What more need be said of this defense counsel. He states openly 'HE DOES NOT CARE' what happens to the defendant regarding due process during jury selection. What more proof need the defendant offer this court as to his defense counsels [sic] mindset." Pet. Supp. Br. [00-CV-4445] at 3.

you selecting one that is least objectionable to you, and that at random, one of those two will be a second alternate. What's your view on that?" [#928/94] V.Tr. at 172-73 [99-72 to 99-73]. The prosecutor responded, "I have no problem," and defense counsel replied, "I have no problem. I don't care which way the Court goes. Either is acceptable to me." Id. at 173 [99-73]. Thus, contrary to petitioner's assertion, counsel did not state that he was indifferent to what happened to his client; rather, he explained that, of the three options, he had no preference as to which alternative the trial court adopted.

In any event, petitioner has not established any prejudice resulting from trial counsel's decision to accept the court's final proposal and thus to waive petitioner's Batson challenge. Petitioner has made no showing that any member of the jury was actually biased, nor has he established that his Batson challenge would have succeeded or that the outcome of the trial would have been different had the Batson challenge not been withdrawn. See Morales v. Greiner, 273 F.Supp.2d 236, 253 (E.D.N.Y. 2003) ("There is simply no cognizable claim under Strickland where the ineffectiveness concerns an alleged Batson violation but no indication of an unrepresentative, biased, or otherwise unfair jury."); see also Johnson v. Norris, 207 F.3d 515, 520-21 (8th Cir. 2000) (although counsel's strategy in selecting a jury was "seriously unprofessional," no prejudice could be shown because it is impossible to determine who would have become jurors if a different strategy had been followed). Indeed, on the existing record, it is equally plausible that further litigation of the Batson motions would have resulted in the granting of the prosecutor's application, to the detriment of the defense. Counsel's decision to accept the court's proposal may well have reflected his reasoned

assessment of the risks involved in defending against the prosecutor's reverse Batson motion, as well as his sound judgment as to the relative weakness of his own Batson challenge. As petitioner's perfunctory argument fails to evaluate counsel's comment in terms of the effectiveness or prejudice prongs of the Strickland test, petitioner's challenge to his trial counsel's effectiveness is unavailing.

### c. Trial Counsel in the Ramsaran Case [00-CV-4448]

In the Ramsaran case, petitioner's claim of ineffective assistance of trial counsel is based on defense counsel's handling of Terence Heyward's testimony. As set forth above (see supra pp. 50-51), defense counsel unsuccessfully offered at trial Heyward's taped statement to the authorities. In the supplemental submissions filed by petitioner's habeas counsel, petitioner appears to argue that trial counsel lacked appropriate knowledge of the applicable rules of evidence and was therefore ineffective. See Pet. Supp. Br. [00-4448] at 2-3.[36] Specifically,

---

[36] Petitioner's supplemental brief contains the following argument:

> [D]efense counsel conceded that the testimony of the witness in question did nothing to disprove defendant's claim of innocence part [sic]. Thus, as a threshold matter, defense counsel admittedly failed to lay a proper foundation for the applicability of C.P.L. § 60.35. Moreover, as one trial court aptly observed, defense counsel was improperly attempting to use his witness's prior statement for its truth, a use explicitly prohibited by C.P.L. § 60.35(2).

Pet. Supp. Br. [00-CV-4448] at 2-3. During a proceeding before this Court, petitioner's counsel elaborated:

> [T]he defense counsel was trying to impeach his own witness in an improper manner which indicates that a defense attorney would not know how to impeach one's own witness if one needed

(continued...)

petitioner argues that defense counsel's attempt to introduce Heyward's out-of-court statement as evidence in chief demonstrated his unfamiliarity with section 60.35 of the C.P.L., which in turn demonstrated his unfamiliarity with the rules of evidence in general. See N.Y. C.P.L. § 60.35; see also Pet. Supp. Br. [00-CV-4448] at 3.[37]

Petitioner satisfies neither the cause nor prejudice prong of the Strickland test. To begin with, the record does not support petitioner's contention that defense counsel was unfamiliar with C.P.L. § 60.35. The fact that counsel attempted to introduce Heyward's sworn statement, despite his subsequent acknowledgment that the statement did not disprove a material element of petitioner's case, may simply reflect an aggressive defense strategy. As the rules of evidence are not self-executing, defense counsel may well have offered Heyward's statement in the hope that his adversary would not object, rather than in ignorance of the applicable rule. In addition, defense counsel's colloquy with the trial court regarding the admissibility of Heyward's statement demonstrates counsel's familiarity with the applicable rules of evidence. Finally, defense counsel ably addressed a multitude of evidentiary issues throughout the trial and, with the exception of the offer of Heyward's statement, petitioner does not complain of the handling

_____

[36](...continued)
> to impeach one's own witness, which indicates that the defense attorney's trial skills are not such that the defense attorney would be able to properly know the rules of evidence and other rules with regard to trial procedures.

12/12/03 Tr. at 7.

[37] Ironically, petitioner claimed in his pro se petition that the trial court erred in refusing to allow Heyward's statement to be presented to the jury because the statement fell squarely within C.P.L. § 60.35. See RX B [00-CV-4448] at 33-36; supra pp. 50-51.

of any of those issues. Thus, petitioner has not established that defense counsel's performance was constitutionally deficient.

Moreover, petitioner does not and cannot show that the outcome of his trial would have been different but for counsel's unsuccessful attempt to put Heyward's hearsay statement before the jury. Had defense counsel declined to make the offer, the record before the jury would have been precisely the same. Thus, petitioner suffered no prejudice as a result of counsel's allegedly deficient handling of the Heyward statement.

### d. Ineffective Assistance of Appellate Counsel

In each of the three cases, petitioner contends that his appellate counsel was ineffective in omitting to present on appeal a claim of ineffective assistance of trial counsel. See Pet. Supp. Br. [00-CV-4447] at 3; Pet. Supp. Br. [00-CV-4445] at 3; Pet. Supp. Br. [00-CV-4448] at 3. The Strickland cause and prejudice test applies with equal force to claims of ineffective assistance of appellate counsel. See, e.g., Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992). A petitioner may establish ineffectiveness by showing that appellate counsel failed to raise "significant and obvious issues" on appeal. Kendrick v. Greiner, 296 F.Supp.2d 348, 360 (E.D.N.Y. 2003) (quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)). However, appellate counsel has no obligation to raise every nonfrivolous claim. See Jones v. Barnes, 463 U.S. 745, 754 (1983).

As petitioner's claims of ineffective assistance of trial counsel are meritless, petitioner cannot establish that appellate counsel's failure to raise such arguments either deprived him of the effective assistance of appellate counsel or prejudiced him in any way. Accordingly,

petitioner's claims of ineffective assistance of appellate counsel are plainly futile.

CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that Ar-Raheem Williams be permitted to amend his three habeas petitions to assert claims under Strickland and that, as amended, all three petitions be denied in their entirety and that the cases be dismissed.

Any objections to the recommendations contained herein must be filed with the Honorable David G. Trager, on or before April 27, 2005. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to transmit copies of this Report and Recommendation, by overnight courier, to petitioner's counsel and respondent's counsel and to mail a copy to petitioner.

SO ORDERED.

Dated:     Brooklyn, New York
           April 12, 2005

                              /s/
                              ROANNE L. MANN
                              UNITED STATES MAGISTRATE JUDGE